## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JENNIFER COUTURE, individually and as
mother and next friend of M.C., a minor child,

       Plaintiff,

vs.                                         Civ. No. 05-972 JCH/DJS

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,
ELIZABETH EVERITT, in her individual and
official capacity, DEBI HINES, in her
individual and official capacity, PAT WILLIS,
in her individual and official capacity, JOE
FLIPPO, in his individual and official capacity,
and JACQUELINE BRADY, in her individual
and official capacity,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' *Daubert* Motion and Brief

to Exclude One of Plaintiffs' Experts, Dr. Davis, filed October 11, 2006 **[Doc. No. 84]**.  The

Court conducted a *Daubert* hearing on Tuesday, March 20, 2007.  Gail S. Stewart, Esq.,

appeared on behalf of Plaintiff, and Michael L. Carrico, Esq. and Brian K. Nichols, Esq., appeared

on behalf of Defendants.  Plaintiff's expert, George E. Davis, M.D., testified at the hearing.

Defendants have not retained an expert to dispute Dr. Davis's conclusions or to challenge the

methodology underlying his conclusions.  The Court, having considered the motion, arguments of

counsel, evidence, and relevant law and being otherwise fully informed, finds that the motion is

not well taken and will be DENIED.

## BACKGROUND

Plaintiff's son Matthew, on whose behalf Plaintiff brings this litigation, transferred to Governor Bent Elementary School during the fall of his first grade year. When Matthew was a danger to himself or others, staff placed him in a "time out" room. Matthew was enrolled at Governor Bent from October 28, 2002, to January 9, 2003.

From January 10, 2003, through February 25, 2003, Matthew was provided instruction at his home. On January 28, 2003, Dr. Crumley began providing Matthew with out-patient care. Thereafter, on February 25, 2003, Plaintiff had Matthew hospitalized at Kaseman Hospital under Dr. Crumley's care because Matthew was a danger to himself and others. While at Kaseman, Matthew was placed in two seclusion rooms. After approximately six weeks of treatment, Matthew stabilized and was released. Since he was released, Matthew has not been readmitted to a hospital for psychiatric care. Matthew, however, has had continuing out-patient psychiatric care.

Plaintiff has retained two expert witnesses to testify in this matter. One of those experts, George E. Davis, M.D., is the subject of this *Daubert* motion. Dr. Davis has spent the last fifteen years as a child psychiatrist in the State of New Mexico, including the recent years (from 2003 to 2005) as the Division Director of the Child and Adolescent Psychiatry Division of the Department of Psychiatry at the University of New Mexico School of Medicine, *See* Exh. 2 (CV of Dr. Davis); Dr. Davis was the Division Director of the Children's Psychiatric Hospital for three years, and his duties were to "oversee" the hospital. Mar. 20, 2006, Tr. at 22, lls. 11-17. Dr. Davis also testified that he has had training and involvement with respect to timeout as a containment or disciplinary method. *Id.* at 23-24.

Dr. Davis has extensive employment experience in the field of child psychiatry, including but not limited to the following:  (1) current employment as a Staff Child Psychiatrist at Zia Behavioral Health (where Dr.  Davis's duties include clinical care in a number of different clinics), (2) current employment as the Director of Psychiatric Services at the State of New Mexico Department of Children, Youth and Families, (3) past employment as the Vice Chair for Child and Adolescent Psychiatry at the University of New Mexico (UNM) School of Psychiatry's Department of Psychiatry, (4) past employment as the Residency Training Director of the Division of Child and Adolescent Psychiatry at UNM School of Medicine, (5) past employment as an Assistant Professor in the Division of Child and Adolescent Psychiatry at UNM School of Medicine, (6) past employment as the Psychiatric Services Director at the Juvenile Justice Division of the Department of Children, Youth and Families, (7) past employment as the Medical Director of the Children's Community Mental Health Clinic, (8) five years of past employment as a Child Psychiatrist at the Indian Health Service at PHS Hospital and at other health clinics, (9) past employment as Medical Director of the Department of Children, Youth and Families, and (10) past employment as Director of the Adolescent Inpatient Unit at the UNM Mental Health Center.  Exh. 2.  Dr. Davis also has served as a Rotation and Clinical Supervisor for the Child Psychiatry Resident Rotation at the Albuquerque Indian Hospital, as a Rotation Supervisor in the Child Psychiatry Resident Rotation at the San Felipe Medical Clinic, and as a Rotation Supervisor in the Child Psychiatry Resident School Consultation in San Felipe, Santo Domingo, and Laguna Pueblos.  *Id.*  Dr. Davis currently cares for patients at the Youth Diagnostic and Development Center, New Mexico Boy's School in Springer, and John Paul Taylor Center in Las Cruces.  *Id.* Dr. Davis also currently cares for 60-70 incarcerated adolescents in state incarceration facilities

and has cared for 60-70 patients as Medical Director and Psychiatrist at the Children's

Community Mental Health Clinic.  *Id.*  Dr. Davis's credentials and professional recognition in the

field of child and adolescent psychiatry include, among other things, a certification in Child and

Adolescent Psychiatry by the American Board of Psychiatry and Neurology, a fellowship in Child

and Adolescent Psychiatry from the University of New Mexico School of Medicine's Department

of Psychiatry, and two Excellence in Teaching Awards given by child an adolescent fellows in

training.  *Id.*  Dr. Davis also has been invited speak at eighteen lectures regarding child and

adolescent psychiatry.  *Id.*

  Plaintiff's counsel asked Dr. Davis to give an opinion as to whether Matthew's

hospitalization at Kaseman was caused, to a reasonable degree of medical probability, in part, by

APS employee's treatment of Matthew while he was at Governor Bent Elementary School.  *See*

Letter from G. Stewart to G. Davis, dated Apr. 24, 2006, admitted into evidence as Pl's Exh. 1

("Exh. 1").  Plaintiff's counsel informed Dr. Davis that she was "not asking [him] to rule out other

factors as additional causes of the symptoms/behaviors for which Matthew was hospitalized."  *Id.*

  In response, Dr. Davis concludes that placement in the timeout room was a cause of

Matthew's subsequent hospitalization.  To explain how he reaches this conclusion, Dr. Davis

states that each child has a "coping capacity" for stress.  *See* Davis Report, admitted into evidence

as Pl's Exh. 2 ("Exh. 2").  "Situational stress" decreases a child's coping capacity.  *Id.*  A number

of "stressors" or conditions could theoretically lower the tolerance level of any given individual

for stress, including youth generally, chronic persistent stressors, and temperamental features

(*e.g.*, anxiety, developmental delays, medical illness, and temporary psychiatric conditions like

depression).  *Id.*  When these stressors decrease a child's coping capacity, the child's "normal

development" is "derailed" and "serious behavior changes" occur. *Id.*

Dr. Davis further explains that the "two primary settings to which a child must adjust for normal development and behavior are obviously home and school. The failure of either of these is sufficient to derail normal development and to induce serious behavior changes." *Id.* "Since a child of elementary school age is seldom able to give a reliable report of his own subjective moods or thoughts in a way that will lead to accurate self-assessment and management of behavior, children of this age will generally simply act out their distress. The best indicator of a child's level of distress is almost always [his or her] behavior." *Id.*

Dr. Davis also explains how application of this model to Matthew's specific case led him to conclude that Matthew's hospitalization was caused in part by APS's treatment of Matthew. Dr. Davis identifies the specific intrinsic and extrinsic stressors weighing on Matthew. *Id.* Dr. Davis maintains that the treatment Matthew received at school "logically assumes a prominent rank." *Id.* As evidence that the treatment at school decreased Matthew's coping ability, Dr. Davis points to Matthew's behavior. *Id.* Dr. Davis notes that Matthew exhibited "remarkably and relentlessly disordered" behavior at school, and that Matthew failed to respond to the "simple behavioral interventions" of the staff. *Id.* When a child, like Matthew, is unresponsive to simple consequences, Dr. Davis opines that "it should always be assumed that there is another underlying cause for the behavior, beyond simple intention." *Id.* "The causes for negative behaviors in elementary age children who are unresponsive to simple consequences [are] usually, but not always, due to either a psychiatric disorder or a specific learning disorder." *Id.* Dr. Davis notes that there is evidence that Matthew had a learning disorder and that he suffered from anxiety, depression, and possibly ADHD. *Id.* Because Matthew had these problems, Dr. Davis maintains

that "persisting or escalating punitive behavioral interventions is neither helpful nor safe. A child who does not respond to moderate consequences or reinforcement will seldom respond to a more intense application of the very same measures." *Id.* According to Dr. Davis, the school considered neither of these factors in Matthew's case, and therefore the "underlying disturbance which was causing the negative behaviors was exacerbated." *Id.*

Dr. Davis does not believe that Matthew's anxiety or depression caused his hospitalization. *Id.* Dr. Davis rules out neuropsychiatric illness as a cause of his hospitalization based upon Matthew's "eventual response to inpatient treatment and his subsequent adjustment to a different school and home setting in another state." *Id.* Instead, Dr. Davis opines that "the deterioration which led to the hospitalization seems to have been the result of situational stress which overwhelmed the coping capacity of this depressed child." *Id.* Dr. Davis concludes that "in the present case, th[e] untenable school situation culminated in hospitalization"; "in this sense, the school's program significantly and seriously contributed to the child's deterioration, which eventually resulted in hospitalization."

In determining the facts of Matthew's particular case, Dr. Davis did not interview Matthew or any of the other persons involved in this matter (*e.g.*, Matthew's doctors, family, teachers, etc.). Rather, Dr. Davis reviewed the documents that Plaintiff's counsel provided him. These documents consisted of (1) Matthew's complete records from Kaseman for his inpatient hospitalization from February 25, 2003, through April 8, 2003, (including admission and discharge summaries); (2) the diagnostic evaluation conducted by APS (psychologist Monica Smart and diagnostician Margaret Dill) to determine whether Matthew was eligible for special education based upon "emotional disability" at Governor Bent; (3) the psychological evaluation

and testing by clinical psychologist Laura Smith, Ph.D., conducted in August 2003 after

Matthew's release from Kaseman; (4) school discipline records (totaling 73 pages) concerning

"incident documentation" and "time out" created by APS employees at Governor Bent

Elementary School between October 28, 2002, and January 9, 2003; and (5) the due process

hearing testimony of three APS employees:  Jacqueline Brady (Matthew's classroom teacher at

Governor Bent), Diane Cook (a Governor Bent classroom teacher from another "emotional

disability" classroom), and Joseph Flippo (the APS psychologist assigned to Governor Bent).

Exh. 1.  Plaintiff's counsel also instructed Dr. Davis to assume various facts that counsel set forth

for him.[1]  *Id.*

### STANDARD

The starting point determining whether expert testimony is admissible is Rule 702 of the

Federal Rules of Evidence.  Rule 702 provides,

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 imposes on a district court a gatekeeper obligation to "ensure that

any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v.*

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Goebel v. The Denver & Rio Grande W.*

*R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) ("Fulfilling the gatekeeper duty requires the judge

---

[1] Defendants do not challenge the substance of any of the facts set forth by Plaintiff's
counsel.

to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts.") (citing *Daubert*, 509 U.S. at 592-93). The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592). The importance of *Daubert's* gatekeeping requirement cannot be overstated. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). As the Supreme Court has indicated, "the objective of that requirement is to . . . make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *Goebel*, 346 F.3d at 992.

To fulfill its gatekeeper obligation, a district court undertake a three-part inquiry. First, the district court must determine whether "the expert[ is] qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) (quoting Fed. R. Evid. 702); *Gallegos v. Swift & Co.*, No. 04-01295-LTB-CBS, 2006 U.S. Dist. LEXIS 63492 (D. Colo. Sept. 6, 2006). Second, the "district court must determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 592). Third, the district court must determine whether the proposed testimony is sufficiently "relevant to the task at hand." *Daubert*, 509 U.S. at 597. The party seeking to admit the expert testimony bears the burden of

proving by a preponderance of the evidence that the expert's testimony is admissible pursuant to Rule 702. *See, e.g.*, *Ralston*, 275 F.3d at 970 (citations omitted); Rule 702, Advisory Comm. Notes (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

With respect to an expert's qualifications, courts consistently have recognized that expert testimony need not be based solely upon scientific training or education; rather, an expert may be qualified in various ways. *See, e.g.*, *Frazier*, 387 F.3d at 1260. Rule 702 explicitly provides that expert status may be based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Committee Note to the 2000 Amendments of Rule 702 also explains that "nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." *Id.* However, "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* (emphasis added).

Once a district court determines that an expert is qualified, the Court next must determine whether the expert's testimony is reliable–*i.e.*, (1) whether method employed by the expert in reaching the conclusion is scientifically sound and (2) whether the opinion is based on facts that satisfy Rule 702's reliability requirements. *Goebel*, 346 F.3d at 991; *see also Daubert*, 509 U.S. at 590 (To be reliable under *Daubert*, an expert's testimony must be "supported by appropriate validation --i.e. 'good grounds,' based on what is known."). "While expert opinions 'must be

based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required.'"  *Goebel*, 346 F.3d at 991 (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)); *see also Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) ("The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the [relevant] scientific community.").  "Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements."  *Goebel*, 346 F.3d at 991.

To assist in the assessment of reliability, the Supreme Court in *Daubert* listed four *nonexclusive* factors that the trial court *may* consider:  (1) whether the opinion at  issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.  509 U.S. at 593-94; *Goebel*, 346 F.3d at 991-92.  The same criteria which are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony.  *Kumho Tire*, 526 U.S. at 152.  The list of criteria, however, "is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors."  *Id.* at 150.  As the Supreme Court has explained, "We can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert* . . . .  Too much depends upon the particular circumstances of the particular case at issue."  *Id.*

In determining reliability, a district court generally should focus on an expert's

-10-

*methodology* rather than the *conclusions* he or she generates.  *Daubert*, 509 U.S. at 595; *Goebel*, 346 F.3d at 992.  However, an expert's conclusions are not immune from scrutiny:  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"); *see also Goebel*, 346 F.3d at 991.

Notwithstanding the dictates of *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amends.).  Daubert did not work a "'seachange over federal evidence law,'" and "'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Id.*  As *Daubert* recognized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

## DISCUSSION

Defendants move to exclude Dr. Davis's testimony on the grounds that (1) he is not qualified to testify about causation, (2) his testimony is based on incomplete facts, (3) his principles and methods lack all of the hallmarks of the scientific method, (4) his testimony contains several impermissible analytical gaps, and (5) his testimony fails to establish either general or specific causation.  The Court considers each of these arguments in turn.

I.      Qualifications.

Defendants maintain that Dr. Davis is not trained to testify about causation generally or the causes of hospitalization specifically.  *Cf. Gallegos*, 2006 U.S. Dist. LEXIS 63492 (district court must determine whether an expert is qualified).  A court may exclude an expert if his or her testimony is outside the subject area of expertise.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969-70 (10thCir. 2001).  In *Ralston*, for example, the Tenth Circuit found that the district court had not abused its discretion in finding an expert unqualified to testify regarding adequacy of warnings when the expert admitted she was not an expert on intramedullary nailing, knew little if anything about the subject, had conducted no research on the subject, had never drafted a warning for any kind of product, and was hired to opine on the subject of bone healing and not adequacy of warnings.  *Id.*  The Circuit rejected the proponent's argument that because the expert was certified as an orthopedic surgeon, she was entitled to rely upon general orthopedic and surgical principles to form her opinion regarding adequacy of warnings.  *Id.*

Defendants claim that although Dr. Davis may have extensive training in certain areas, he does not have training, and therefore is not an expert, in the causes of hospitalization.  Unlike the expert's qualifications in *Ralston*, however, a careful review of Dr. Davis's curriculum vita and his testimony reveals that Dr. Davis has extensive experience (over twenty years) in the relevant field of child and adolescent psychiatry.  In addition, Dr. Davis has spent substantial time practicing child and adolescent psychiatry in hospitals and mental health clinics.  Dr. Davis, for example, was the Division Director of the Children's Psychiatric Hospital for three years.  Mar. 20, 2006, Tr. at 22, lls. 11-17.  Dr. Davis also testified that he has had training and experience with timeout as a containment and disciplinary method.  *Id.* at 23-24.  The Court concludes, based upon Dr. Davis's

-12-

experience, education, and training, *see supra* at 2-4, all of which the Court relies upon, that Plaintiff has established that Dr. Davis is qualified by a preponderance of the evidence to give an opinion as to whether timeout was a cause of Matthew's hospitalization.

It is unclear whether Defendants also contest Dr. Davis's qualifications as an expert on the ground that he bases his opinion on his experience in the field. *Cf. Ralston*, 275 F.3d at 969 (court must first determine whether "the expert[ is] qualified by 'knowledge, skill, experience, training, or education' to render an opinion"). Expert testimony need not be based solely upon scientific training or education; rather, an expert may be qualified in various ways, including by experience and knowledge. *Frazier*, 387 F.3d at 1260 (citing Fed. R. of Evid. 702). However, "if the witness is relying solely or primarily on experience, . . . [t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 Advisory Comm. Note (2000 Amends.). Where an expert basis his opinion on nothing more than his experience, the witness "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.*

Defendants argue that Dr. Davis's opinion regarding coping capacity and stressors is wholly speculative and that it is supported by nothing more than "it is what I say because I say it is so." Dr. Davis, however, does not base his conclusion solely on his experience. Dr. Davis reviewed, among other things, APS's timeout records, Matthew's hospital records from his inpatient stay at Kaseman, psychological evaluations of Matthew, and the due process hearing testimony of three APS employees. In addition, Dr. Davis was in the position of knowing the outcome of the culmination of Matthew's stress:  increasingly serious behavior changes and in-

-13-

patient hospitalization.  Dr. Davis also testified that his theory is widely accepted in his field.  *See* Deposition of G. Davis, p. 35, ll.18-21, attached to Pl's Resp. in Opp. to Defs' *Daubert* Motion. Moreover, even if his experience plays a substantial role in his opinion regarding coping capacity and stressors, Dr. Davis explains how his experience leads to the conclusion he reached. Specifically, Dr. Davis testified that fifteen years of examining children who have been hospitalized, as well as the opinions of their treating psychologists and physicians with whom he spoke, served as comparables.  *Id.* at 80, lls. 8-15.  The Court therefore concludes that Plaintiff has satisfied her burden of demonstrating by a preponderance of the evidence that Dr. Davis is qualified by "'knowledge, skill, experience, training, or education' to render an opinion" in this case.  *Ralston*, 275 F.3d at 969.

II.    Sufficient Facts.

       Defendants maintain that Dr. Davis relied upon incomplete facts to form his opinion and that his testimony therefore lacks a reliable foundation.  Federal Rule of Evidence 702 specifically requires expert testimony to be based upon "sufficient facts or data."  Fed. R. Evid. 702; *Black v. M&W Gear Co.*, 269 F.3d 1220, 1237 (10th Cir. 2001) (expert testimony must be based upon a reliable foundation); *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (testimony must be "based on facts which sufficiently satisfy Rule 702's reliability requirement").  According to Defendants, the facts on which Dr. Davis bases his opinion are incomplete (and therefore unreliable) because he (1) based his opinion on selected data from Plaintiff's counsel, (2) erroneously thought that Matthew was confined to a seclusion room only once by doctors at Kaseman, (3) did not interview Matthew or anyone else involved in this matter, and (4) did not consider other stressors in Matthew's life, which, according to Davis's model, would have

-14-

contributed to his hospitalization.

With respect to their first argument, Defendants cite various cases indicating that expert opinions based upon selected data are unreliable and therefore inadmissible.  In each of these cases, however, the underlying data was either blatantly biased or materially inaccurate.  In contrast, the records reviewed by Dr. Davis were not prepared by Plaintiff's counsel (and, indeed, were primarily prepared or to testified to by APS employees), *compare TMI Litig*, 193 F.3d 613, 697 (3d Cir. 1999) (medical summaries on which plaintiff's expert based her opinion were unreliable because the summaries were prepared by non-medical attorneys for the plaintiff to be sufficient; an expert must obtain facts by interviewing patients or obtaining their medical records), the timeout records from APS and the Kaseman hospital records were not whittled down to eliminate portions of the records that did not support Plaintiff's case, *compare Crowley v. Chait*, 322 F. Supp. 2d 530 (D.N.J. 2004) (expert hired to "test the testimony of the former claims supervisors" did not rely upon sufficient facts where he considered only eight of 150 depositions, because those eight depositions supported plaintiff's view and the remaining 142 depositions undercut that view), and there is no evidence that Plaintiff's counsel handselected the due process hearing testimony of APS employees Jacqueline Brady, Diane Cook, and Joseph Flippo, and excluded other hearing testimony that was contradictory, *compare id.*  Moreover, Defendants point to no evidence indicating that the records reviewed by Dr. Davis were inherently unreliable-- *i.e.*, that the timeouts did not occur as recorded (by APS's own employees), that the psychological and diagnostic evaluations (on which APS relied to justify placement of Matthew in a ED classroom) were inaccurate, that the hospital records from Kaseman (prepared by independent physicians and medical staff) were incorrect, that the evaluation conducted by Laura

-15-

Smith, clinical psychologist, was unreliable, or that the facts presented by Plaintiff's counsel were erroneous. *Compare id.*; *see also Black*, 269 F.3d at 1237 (excluding testimony where expert was unaware of basic facts regarding the lawnmower on which he was giving an opinion as to causation). Although Defendants argue that Dr. Davis erroneously believed that medical staff at Kaseman used timeout only once, this factual error is not material; Dr. Davis specifically testified that the number of times Kaseman used timeout was "irrelevant" to his conclusion and opinions because the timeouts at APS and the timeouts at Kaseman were materially different "[i]n more ways than [Dr. Davis] c[ould] recite." Mar. 20, 2007, Tr. at 25, line 1; *id.* at 31.[2] Defendants produced no expert to contradict this testimony. The Court therefore concludes that the cases cited by Defendants do not apply because the facts and data relied upon by Dr. Davis were neither biased nor materially erroneous.

Rather, the factual underpinnings of Dr. Davis's conclusions were sufficient to meet Rule

---

[2] The timeout room at APS was essentially a closet; it was small and rudimentary with no place to sit. Mar. 20, 2007, Tr. at 25. An APS staff member would use physical force, against Matthew's will, to keep the door to the timeout room shut. *Id.* at 25-26. Defendants' actions were punitive and retaliatory. Defendants would extend the time Matthew was contained (for long periods) if Matthew did or said anything offensive; if Matthew became distressed or frantic they also would extend the time. *Id.* When Matthew was frantic, Defendants would hold the door and not allow him to make any kind of exit. *Id.* Defendants would not give Matthew any contact with providers or adults; the more distressed Matthew became, the more isolated and longer the timeout. *Id.* at 26. The notes of APS employees show that they were "frankly hostile" and "transparently disliking" of Matthew. *Id.* In contrast, hospitals do not use containment timeouts for discipline; they use it solely for safety. *Id.* For a child Matthew's age, a hospital would use timeout in the form of discipline in the form of sitting in the corner. *Id.* at 26-27. A hospital would not put a child in a contained space when the child is frightened or frantic; and, if it did place a child in a contained space, the hospital would not continue to contain the child if he or she became frantic or distressed. *Id.*

702's reliability standard for admissibility.  Plaintiff's counsel asked Dr. Davis to review complete records of Matthew's timeouts, totaling 73 pages, *prepared by APS's own staff*; testimony *given by APS's own staff* at the due process hearing; complete records from Matthew's in-patient hospitalization, *prepared by independent medical staff*, and psychological and diagnostic evaluations *conducted by APS's psychologists*.  Although Dr. Davis reviewed clinical psychologist Laura Smith's evaluation and facts provided to him by Plaintiff's counsel, Defendants have not argued (and there is no evidence demonstrating) that the evaluation itself, or any of the specific facts, was inherently erroneous, unreliable, or inaccurate.  The Court therefore concludes that Plaintiff has satisfied her burden by a preponderance of the evidence of demonstrating that Dr. Davis relied upon facts sufficient to satisfy the reliability requirements of Rule 702.  Any argument that Dr. Davis should have reviewed additional information, or should have interviewed other witnesses, goes to the weight of Dr. Davis's testimony, Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amends.) ("the rejection of expert testimony is the exception rather than the rule"; *Daubert* did not work a "'seachange over federal evidence law,'" and "'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system'"), and the Court fully expects Defendants to raise these omissions on cross-examination, *cf. Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

Defendants's argument that the facts underlying Dr. Davis's opinion were incomplete because Dr. Davis failed to directly observe and evaluate Matthew before forming his opinion does not persuade the Court to hold otherwise.  Defendants confuse a clinical judgment based

upon direct observation of a patient's condition for the purpose of diagnosis with the application

of clinical experience to establish a causal link between the use of timeout and subsequent

hospitalization.  Dr. Davis readily concedes that personal observation would be necessary if Dr.

Davis were seeking to diagnose Matthew.  *See, e.g.*, Mar. 20, 2007, Tr. at 29 (testimony of G.

Davis, M.D.) (conceding that he would need to interview Matthew to give a diagnosis).  Dr.

Davis, however, specifically testified that he was not attempting to diagnose Matthew and that it

therefore was unnecessary for him to directly evaluate Matthew to form his opinion about

causation. *Id.*  Defendants produced no expert witness to contradict Dr. Davis's testimony.

Because Plaintiff offers Dr. Davis's testimony not to diagnose Matthew but rather to prove that

APS's treatment of Matthew caused, in part, Plaintiff to incur damages arising out of Matthew's

2003 hospitalization, the Court concludes that Dr. Davis's failure to personally observe Matthew

or interview his doctors does not render his testimony inadmissible.[3]  The Court further concludes

---

[3] Defendants argue that by asserting he does not need a personal interview to establish causation in the context of damages, Dr. Davis applies a lower standard to his legal testimony than he would in his practice.  Specifically, Defendants' counsel maintains, "Under *Daubert* and 702 your report has to be based on the standard of care that you would provide to a child if you were responsible to provide that child treatment."  Mar. 20, 2007, Tr. at 15, lls 12-14.  The Supreme Court has indicated that a court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  This admonition, however, does not mean that an expert must always apply the same standard of care as he or she would if making a diagnosis.  Courts have recognized that mental health experts can testify to matters outside of a diagnosis. *Jensen v. Eveleth Taconite Co.*, No. 5-88-163, 1996 U.S. Dist. LEXIS 17978 (D. Minn. Mar. 28, 1996), *rev'd on other grounds by* 130 F.3d 1287 (8th Cir. 1997).  And when so doing, an expert must apply the same standard of care in making a legal opinion as he or should would in making that same conclusion in the expert's "practice." *Kumho Tire*, 526 U.S. at 152.  Therefore, if an expert is a researcher, and not a diagnostician, that appropriate standard is that which governs the expert's research in his or her practice as a researcher.  Accordingly, Dr. Davis need only apply the same standard in determining causation of hospitalization in this Court as he would if he were, for instance, writing an article on the causes of hospitalization.

that although the lack of direct observation does not render Matthew's testimony inadmissible under Rule 702, Dr. Davis's failure to interview Matthew or obtain other information shall be subject to cross-examination at trial.

Defendants's argument that the facts underlying Dr. Davis's opinion are insufficient because Dr. Davis ignores other stressors that may have caused Matthew's hospitalization likewise is unpersuasive. Defendants maintain that Dr. Davis failed to determine whether Plaintiff's car accident, Matthew's change of residence and school, Plaintiff's new career, and Plaintiff's new boyfriend were causes of Matthew's hospitalization.[4] In addition, it is undisputed that Dr. Davis had no information about Matthew's misbehavior before he attended Governor Bent, Matthew's time at St. Timothy's where he assaulted a teacher and was expelled, the two years of care Matthew received from Dr. Muhlenweg, the home-bound schooling Matthew received prior to being admitted to Kaseman, or Matthew's behavior change after his hospitalization when he was placed on medication.

The coping capacity/stressor model explicitly recognizes other stressors as causes of "derail[ment]" of "normal development" and "serious behavior changes," Exh. 2, so the presence of any one stressor is not necessarily negated by the presence of another stressor. Plaintiff seeks to admit Dr. Davis's testimony for the very narrow purpose of establishing that APS's treatment of Matthew caused, in part, Matthew's hospitalization. Accordingly, under this model, the existence of other stressors in Matthew's life would not eliminate APS's use of restraint and timeout as *one cause* of Matthew's hospitalization. As such, the failure to specifically analyze

---

[4] Dr. Davis reviewed the Kaseman hospital records which listed each of these as additional stressors in Matthew's life. Defendants nonetheless maintain that Dr. Davis ignored these facts and failed to determine whether they caused Matthew's hospitalization.

whether Matthew's change of residence caused his hospitalization and the failure to learn about other stressors in Matthew's life, while relevant to the weight of Dr. Davis's testimony, does not render the factual underpinnings of Dr. Davis's opinion insufficient or unreliable for purposes of admissibility.[5]

III.    Reliability of Principles.

Defendants argue that the principles underlying Dr. Davis's opinion, specifically the coping capacity/stressor model, lack all hallmarks of the scientific method.  Defendants maintain that the theory is speculative and circular in that Dr. Davis concedes that the stressors have different effects on different people and that "everything" goes into determining whether a stressor impacts a person's coping capacity or is only a "situational stressor."  Moreover, Defendants challenge the theory on the ground that when stressors "cause" an outcome, Dr. Davis can only say that the stressors were additive; remove one stressor, and Dr. Davis cannot tell whether the outcome would be different.  Because Defendants challenge the principles upon which Dr. Davis bases his opinion, the Court must determine whether the testimony has a reliable basis in the psychiatry field.  *Kumho Tire*, 526 U.S. at 149 ("where [an expert] testimony's . . . principles . . . or their application are called sufficiently into question .  . . [a] trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.") (internal quotations and citation omitted).

In evaluating the reliability of Dr. Davis's principles, the Court first considers whether Dr. Davis's testimony meets the nonexclusive factors identified in *Daubert*:  (1) whether the opinion

---

[5] If Plaintiff sought to establish that APS's treatment of Matthew was the "sole cause" or a "substantial cause" of Matthew's hospitalization, their expert would be required to examine and rule out other causes of the hospitalization.

at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion

has been subjected to peer review; (3) whether there is a known or potential rate of error

associated with the methodology used and whether there are standards controlling the technique's

operation; and (4) whether the theory has been accepted in the scientific community.  509 U.S. at

593-94.  Defendants argue that Dr. Davis's testimony meets none of these factors.  According to

Defendants, Dr. Davis admits there is no way to test his theory because it would be too

"complicated"; there is no way for his peers to test his conclusion; there is no way to calculate the

rate of error; and there is no evidence or literature to support Dr. Davis's theory.  Dr. Davis did

testify that his peers could replicate his conclusion by forming their own opinions and that his

theory would be widely accepted in his field.  Deposition of G. Davis at 35, lls. 18-23, attached to

Pl's Resp. in Opp. to Defs' Daubert Motion.

   Although the factors, strictly applied, may weigh against admissibility, courts repeatedly

have indicated that *Daubert* may not apply at all, particularly in the field of a "soft sciences" like

psychiatry.  Dr. Davis is a psychiatrist who deals with the imprecise discipline of medicine, and

particularly psychiatry.  Courts have warned against strict application of *Daubert* to medical

testimony.  *See, e.g.*, *Delaware v. McMullen*, 900 A.2d 103, 115-16 (Del. Super. Ct. 2006)

(difficult dynamic to apply *Daubert* to clinical medical testimony that is not based in "hard

science" such as was at issue in *Daubert*).  As such, strict application of the *Daubert* factors is not

appropriate.

   The Advisory Committee to the 2000 Amendments to Rule 702 noted other factors a

court may consider if the *Daubert* factors are not applicable:  (1) whether the experts are

proposing to testify about matters growing naturally and directly out of research they have

conducted independent of litigation or whether they have developed their opinions expressly for the purpose of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he or she would be in his or her regular professional work outside litigation consultation; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert intends to give.  Fed. R. Evid. 702, Advisory Committee Note (2000 Amend.).

With respect to the first factor, Dr. Davis testified that he has had extensive experience with timeout, Mar. 20, 2007, Tr. at 23, and that he has had the opportunity to observe comparable children in in-patient settings for fifteen years, Deposition of G. Davis at 80.  As a long-time child psychiatrist, Dr. Davis has had substantial opportunity to apply the coping capacity/stressor principle in his practice.  With respect to the second factor, in forming his opinion with respect to Matthew, Dr. Davis has not impermissibly extrapolated from the coping capacity/stressor principle.  With respect to third factor, Dr. Davis's opinion expressly accounts for obvious alternative explanations; Dr. Davis has indicated that these are also causes of Matthew's hospitalization.  With respect to the fourth factor, there is no evidence that Dr. Davis would adopt a different view of causation if he were, for example, writing an article about the causes of hospitalization.  With respect to the fifth factor, there is no evidence that a field other than psychiatry or psychology could reach more reliable results with respect to the question of the causes of mental health hospitalization for children.  Because Dr. Davis's testimony meets each of these factors, the Court concludes that the testimony is reliable and should not be excluded.

V.    Alleged Analytical Gaps.

Defendants argue that the Court must exclude Dr. Davis's testimony because his theory contains several impermissible analytical gaps.  Although generally a district court should focus on an expert's methodology rather than the conclusions the expert generates, *Daubert*, 509 U.S. at 595; *Goebel*, 346 F.3d at 992, an expert's conclusions are not immune from scrutiny:  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146 ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.")  In analyzing the factual underpinnings of an expert's opinion, however, the Tenth Circuit has taken a cautious approach: "Despite our expertise on the law, our role as judges is not to second-guess well qualified and highly trained medical experts on difficult judgment calls within their field of expertise; . . . [n]either the district court nor this court is in a position to declare or even to know with any degree of certainty whether otherwise admissible expert testimony is, in fact, correct."  *Goebel*, 346 F.3d at 993-94 (citing *Daubert*, 509 U.S. at 596).

Defendants maintain that Dr. Davis's conclusions suffer from the following analytical gaps:  (1) Dr. Davis does not know whether Matthew would have been hospitalized if he never had been placed in the timeout room (*i.e.*, whether the other stressors were sufficient to cause hospitalization), (2) Dr. Davis cannot explain how Matthew showed marked improvement and stabilized at Kaseman even though hospital personnel placed Matthew in two types of seclusion rooms, (3) Dr. Davis cannot explain how use of the timeout room at Governor Bent caused hospitalization when Matthew did not attend Governor Bent for the seven weeks immediately

preceding hospitalization, and (4) Dr. Davis cannot explain how the use of timeouts in school after hospitalization did not cause a second hospitalization.  While obviously fodder for cross-examination, these alleged shortcomings, however, are not gaps in analytical reasoning sufficient to render Dr. Davis's testimony inadmissible.  For example, with respect to the first "gap," Dr. Davis has opined, based upon the coping capacity/stressor model, that Defendants' treatment of Matthew was one of many known and possible unknown stressors and that each stressor is additive; therefore, once the stress of APS's actions occurred, it became a contributing factor, regardless of the presence of any other stressors that caused Matthew's hospitalization and regardless of the extent of its contribution (which presumably would be diminished by the presence of other stressors) to Matthew's hospitalization.  With respect to the second "gap," this Court already has concluded that the use of a seclusion room at a hospital differs from Defendants' actions at Governor Bent, and therefore the use of seclusion at Kaseman does not constitute an analytical gap.  With respect to the third and fourth "gaps," Dr. Davis's theory of additive stressors expressly recognizes why a single stressor, like placement in a timeout room, might sometimes, when other stressors are high, result in hospitalization, and other times, when stressors are low (say, for example, after Matthew received treatment and medication at Kaseman), not result in hospitalization.  In sum, because the coping capacity/stressor model explicitly recognizes other causes of hospitalization, and because Dr. Davis's testimony seeks to establish such a narrow form of causation ("a" cause, among a possible multitude of causes, of hospitalization), Defendants' argument regarding the alleged analytical gaps is not persuasive.

Defendants also argue that Dr. Davis bases his opinion on nothing more than "it is what I say because I say it is so."  In the context of determining whether an impermissible analytical gap

between the data and an expert's conclusion exists, the Supreme Court had stated, "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Joiner*, 522 U.S. at 146; *see also Daubert*, 43 F.3d at 1316 (on remand) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough").  Defendants argue that Dr. Davis concludes that timeouts cause hospitalization on nothing more than his say so because the coping capacity/stressor principle underlying his ultimate conclusion, is "impenetrable" and "unverifiable."  As a result, in Defendants' minds, Dr. Davis effectively has no basis for his ultimate conclusion that Defendants' actions were a cause of Matthew's hospitalization.

        In support of their argument, Defendants cite *Grier v. Education Service Unit No 16*, 66 F.3d 940, 943-44 (8th Cir. 1995), which involved claims by disabled students against a school district.  There, the plaintiffs sought to establish emotional, physical, and sexual abuse through the testimony of three expert witnesses, all of whom would offer clinical opinions based upon a review of child behavior checklists, clinical interviews of the students, and an assessment of the plaintiff parent's credibility.  *Id.* at 943.  The Court concluded that this methodology was unreliable because the behavior checklists that were not validated, the clinical interview protocol did not provide any specific guidance for conducting the interviews, and the protocol was not followed by the experts properly.  *Id.*  In explaining the impact of the "vague psychological profiles" and flawed methodology, the court stated, "an expert using this methodology may candidly acknowledge any inconsistencies or potential shortcomings in the individual pieces of evidence she presents, but can easily dismiss the critique by saying that her evaluation relies on no

one symptom or indicator and that her conclusions still hold true in light of all the other available factors and her expertise in the field.  In such a case, the expert's conclusions are as impenetrable as they are unverifiable."  *Id.* at 943.

Defendants maintain that Dr. Davis has issued an opinion on a methodology less reliable than that employed in *Grier*, and that the principles of coping capacity and stressors underlying his opinion is subject to the same criticisms as the methodology employed in *Grier*.  As such, Defendants claim that Dr. Davis is left with the sole support for his conclusion of "it is what I say because I say it is so."

*Grier* is distinguishable, however, and therefore does not weigh in favor of exclusion of Dr. Davis's testimony.  First, although Defendants claim that Dr. Davis bases his finding on a methodology more suspect than that used by the experts in *Grier* (because Dr. Davis merely reviewed the documents provided to him by Plaintiff's counsel and accepted the assumptions she asked him to make, whereas the *Grier* experts conducted studies), the Court already has determined that the documents reviewed by Davis, which were created by APS's own staff and by independent medical professionals, were impartial and accurate and therefore intrinsically reliable. In contrast, the experts in *Grier* relied upon intrinsically unreliable information.  For these reasons, not applicable here, the conclusions of the *Grier* experts that abuse occurred were "impenetrable" and "unverifiable."  *Id.* at 943.

Second, the *Grier* experts' opinions were "impenetrable" because their unreliable methodology allowed the experts to downplay countervailing evidence weighing against abuse. Here, the principles underlying Dr. Davis's opinion do not ignore contrary evidence but rather expressly recognize and accept the existence of other stressors; Dr. Davis readily admits that

other stressors were contributing causes of Matthew's hospitalization. As such, there is nothing impenetrable about the coping capacity and stressor principle.

Third, the *Grier* opinions were "impenetrable" because the plaintiffs sought to create facts sufficient to indicate that alleged abuse happened for the purpose of establishing liability. Dr. Davis's testimony does not serve as evidence to establish the conduct (repeated use of the timeout room). Rather, that conduct is documented in 73 pages of APS's own records and does not need to be substantiated through expert testimony. Therefore, while the *Grier* expert's conclusions were impenetrable (because they were based upon unsound methodology that allowed the expert to acknowledge inconsistencies but dismiss any critique by saying the evaluation relies on no one symptom and that the conclusions still hold true in light of other factors), Dr. Davis's opinions are not impenetrable or unverifiable (because they are based upon facts contained in APS's own records).

Finally, the experts' opinions in *Grier* are distinguishable because the experts were traipsing into the realm of hard science to establish the existence of a physical act, *i.e.*, abuse of disabled students by school employees. The district court in *Grier* implicitly recognized this fact at the outset and expressed "general reservations regarding the use of psychological evaluations as evidence of child abuse." *Id.* In determining reliability, a court may consider whether the expert's field is known to reach reliable results for the type of opinion the expert will give. Fed. R. of Evid. 702, Advisory Comm. Note (2000 Amends.). In *Grier*, the court expressly recognized reliability concerns related to psychologists testifying to the existence of abuse and there was no evidence that experts in psychology reach reliable results through the use of psychological evaluations; it is not difficult to imagine that more reliable evidence of abuse would include hard

facts, such as testimony of the victim, testimony of a third-party witness, or the existence of physical injuries. Here, in contrast, Dr. Davis uses psychiatry in its common application of explaining intangible aspects of the human experience--specifically, what types of external and internal stressors decrease a child's coping capacity and lead to derailment of normal development and serious behavior changes. Members of the psychiatric community accept the coping capacity and stressor theory. Deposition of G. Davis at 35, attached to Pl's Resp. in Opp. to Defs' Daubert Motion; *see e.g.*, *Jensen v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997) (expert's theory recognized that other "stressors" could be causes of emotional distress); *Bell v. Gonzales*, No. 03-163 (JDB), 2005 U.S. Dist. LEXIS 37879 (D.D.C. Dec. 23, 2005) (expert's theory recognized that emotional distress may be caused when stressors decrease internal reserves); *Webb v. Hyman*, 861 F. Supp. 1094 (D.D.C. 1994) (expert's theory based upon concept that stressors may destroy coping mechanisms). Because Dr. Davis's testimony is reliable and accepted in the psychiatry field, *Grier's* reasoning does not apply.

VI.    <u>General and Specific Causation</u>.

Defendants argue that the Court should exclude Dr. Davis's testimony because it does not establish general and specific causation. The Court disagrees. To establish general causation (that timeouts can cause hospitalizations), Dr. Davis has opined that each child has a "coping capacity" for stress, that situational stress decreases a child's coping capacity, and that a number of stressors could theoretically lower the tolerance level of any given individual for stress; when these stressors decrease a child's coping capacity, the child's "normal development" is "derailed" and "serious behavior changes" occur, which in turn causes hospitalization. Although Dr. Davis's opinion does not eliminate other possible causes of hospitalization (to the contrary, it expressly

-28-

recognizes other causes), this Court already has concluded that the presence of other causes of hospitalization does not eliminate timeouts as a cause of hospitalization.  Dr. Davis's testimony also establishes specific causation (that the timeouts were a cause of Matthew's hospitalization).  Dr. Davis has explained that school played a prominent role in Matthew's life and that APS's treatment of Matthew was a stressor.  When combined with other stressors in Matthew's life, his coping capacity decreased, behavior changes occurred, and hospitalization resulted.  The Court therefore concludes that Dr. Davis's testimony establishes both general and specific causation.

Defendants's citation to *Miller v. Pfizer*, 356 F.3d 1326 (10th Cir. 2004), does not persuade the Court otherwise.  In *Miller*, the plaintiff was attempting to demonstrate that Zoloft was the cause of the decedent's suicide.  *Id.* at 1328.  The court, before disallowing the plaintiffs' expert, appointed a panel of independent experts to review peer literature and research.  *Id.* at 1329.  It was on the basis of the information amassed by those independent experts that the court concluded the plaintiffs' expert's opinion lacked scientific reliability.  *Id.* at 1331.  The Tenth Circuit in *Miller* affirmed the district court's exclusion of the expert testimony on causation on the ground that the expert failed to provide reliable testimony as to general causation (that Zoloft can cause suicide) and specific causation (that Zoloft caused Matthew Miller to commit suicide). *Id.* at 1331, 1335.  Defendants argue that under *Miller* Dr. Davis's testimony must be excluded.

Although the Tenth Circuit in *Miller* found that the plaintiff had not established general and specific causation, the facts of *Miller* are distinguishable from those here.  First, the plaintiff in *Miller* was seeking to establish that Zoloft was the sole cause of the decedent's suicide.  *Id.* at 1327.  As such, it was important that the expert's methodology eliminate other potential causes of the suicide.  When an independent panel of experts set forth persuasive evidence that the expert's

-29-

methodology was unsound and not reliable, the *Miller* court concluded that the plaintiff could not establish causation. *Id.* at 1331. Here, in contrast, Plaintiff seeks only to establish the narrow proposition that APS's treatment of Matthew was "a" cause of Matthew's hospitalization. Dr. Davis expressly recognizes that there were other causes of Matthew's hospitalization and that all of these causes (stressors) combined together to lower Matthew's coping capacity and create serious behavioral changes, which in turn caused Matthew's hospitalization. Moreover, unlike the methodology in *Miller*, this Court already has concluded that the methodology employed by Dr. Davis was reliable. *See supra* § II.

The Court concludes that the facts of this case are more analogous to *Williams v. Guadalupe County*, No. SA-04-CA-1058-RF, 2006 U.S. Dist. LEXIS 45620 (W.D. Tex. Apr. 25, 2006), in which the district court admitted the testimony of psychologists testifying that the failure of proper procedures and adequate standards of care caused a detainee (with a preexisting mental illness) confined in a holding cell to commit suicide.[6] *Id.* at *13. Williams is analogous in that there the experts were not attempting to diagnose their subjects (and therefore did not undertake a sole or substantial cause analysis); rather, the experts sought to determine whether the defendants' failure to provide policies and an adequate standard of care was a contributing factor of the suicide. *Id.* Moreover, as here, the experts in *Williams* testified to matters within

---

[6] Although Defendants argue that the expert in *Williams* was not testifying to causation, the *Williams* court expressly noted that the plaintiff's experts were testifying to causation. *Id*. at *13 (recognizing that both experts testified "how the failure of [adequate policies and the appropriate standard of care in dealing with mentally ill detainees] was a contributing factor to James Fox's suicide"); *see also id.* at *11 (expert testified "that a combination of the individual detention officers' actions and the absence of meaningful mental health policies, procedures, and formal training *led* to James Fox's suicide"); *id.* at *13 (expert testified that "if the proper procedures had been followed at the detention center, James Fox's suicide could have been avoided").

the realm of "soft-science" and not "hard-science."[7]  *Id.* at *3, 10-12.  The Court in *Williams* found the testimony admissible as the Court does here.

## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has established by a preponderance of the evidence that Dr. Davis's testimony meets the requirements of Federal Rule of Evidence 702.  **IT THEREFORE IS ORDERED** that Defendants' *Daubert* Motion and Brief to Exclude One of Plaintiffs' Experts, Dr. Davis, filed October 11, 2006 **[Doc. No. 84]**, is hereby **DENIED**.

Dated this 28th day of March 2007.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE

---

[7] *Williams* dealt with a failure of policies and procedures and an adequate standard of care which caused in part the plaintiff's injuries.  Here, APS's treatment of Matthew, which Plaintiff maintains caused in part Matthew's hospitalization, was at issue.  The expert in *Miller*, in contrast, dealt with the ingestion of a medical drug which produced medical side-effects which caused suicide.