## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JENNIFER COUTURE, individually and as
mother and next friend of M.C., a minor child,

       Plaintiff,

vs.                                           Civ. No. 05-972 JCH/DJS

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,
ELIZABETH EVERITT, in her individual and
official capacity, DEBI HINES, in her
individual and official capacity, PAT WILLIS,
in her individual and official capacity, JOE
FLIPPO, in his individual and official capacity,
and JACQUELINE BRADY, in her individual
and official capacity,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Motion for Summary Judgment on

Grounds of Qualified Immunity for Defendants Brady, Willis & Flippo ("Defendants"), filed May

1, 2006, **[Doc. No. 29]**.  The Court, having considered the motion, arguments of counsel,

evidence, and relevant law and being otherwise fully informed, finds that Defendants' motion for

summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is well

taken and will be granted; Defendants' motion for summary judgment on Plaintiff's Fourth

Amendment seizure claim, Fourteenth Amendment procedural due process claim, supervisory

liability claims, and official capacity claims is not well taken and will denied.

## BACKGROUND.[1]

In October 2002, APS determined that Matthew was eligible for receipt of special education on the basis of the disability "emotional disturbance."  From October 28, 2002, to January 9, 2003, Matthew attended Governor Bent Elementary School, which had a classroom, taught by Defendant Jacqueline Brady for children with emotional disturbances.  Defendant Brady's classroom was comprised of five to seven children.

Defendant Brady had experience with special needs children.  Immediately before working at Governor Bent, Defendant Brady served for two years as the educational director of day treatment at the Children's Treatment Center.  Before that, Defendant Brady served for eight months as the behavior manager for a child at Cleveland Middle School.

Before Matthew began attending Governor Bent, Plaintiff signed an Individualized Education Program developed on October 16, 2002, which specified "supervised time out" (but not use of a "timeout" room) as one among other interventions.  A Behavioral Intervention Plan (BIP) prepared on December 17, 2002, indicated that Matthew would be placed in "time out if he loses control and if he threatens to hurt self or others."  Plaintiff did not specifically authorize use of the timeout room at issue here.

While in Defendant Brady's class, Matthew consistently was disruptive and angry.  At one point, Plaintiff reported that Matthew was having seven to ten tantrums at school daily, most of which were maximum intensity and lasted from ten minutes to one hour.  Matthew hit and kicked his desk daily and approached other children aggressively.  Matthew regularly threatened teachers

_____

[1] Except where otherwise noted, the following facts are either undisputed or construed in Plaintiff's favor.

and other students.  Matthew would yell, "You're dead.  I'm going to kill you.  I'm going to throw hot oil on you and a match and gasoline," or "F*** you.  F*** you, you f***ing sons of b******.  You b******.  I'm going to kill you.  I'm going to throw cat guts and blood on you." Because she worked with Matthew one on one, Wendy Orr, Defendant Brady's educational assistant, was often a physical target of Matthew's violence.  Matthew punched her in the stomach once, tried (and often succeeded) to kick her daily, and spit on her.

Matthew's behavior severely impacted the other children in the classroom.  Essentially, Defendant Brady and Ms. Orr had to spend time ensuring the safety of these children and re-teaching them self-control instead of advancing their education.

Matthew's behavior at home also was problematic.  Plaintiff reported that Matthew was having tantrums at home in December 2002, and during a mental health team meeting on January 6, 2003, Plaintiff disclosed that Matthew "pulled a butcher knife" on her.  She also stated that Matthew was upset because Plaintiff's boyfriend was living with them and that Matthew's behavior had deteriorated since her boyfriend had moved in.  In December 2002, Matthew's pediatrician indicated that Matthew might be bipolar and emphasized the "importance of moderating the changes that have occurred," referring to Plaintiff's move and her boyfriend's presence.

Defendant Brady and Ms. Orr developed innovative techniques to de-escalate and re-direct Matthew so that they could teach him academics.  These techniques included an award system, not directing attention to negative attention-seeking behaviors, physical proximity, redirection through soft touching, and verbalization of needs through calm discussion.  When Matthew's behavior escalated, Defendant Brady and Ms. Orr would ask Matthew whether he

needed a timeout at his desk, in the timeout chair, in the timeout room, or even outside.  By asking questions and presenting options, Defendant Brady and Ms. Orr tried to teach Matthew the skill of self-redirection, so that Matthew could focus his attention on academics.  Unfortunately, Matthew's use of self-timeout was often counterproductive because Matthew would leave the timeout area and intimidate other children.

The timeout room in Defendant Brady's classroom was another technique to teach students self control and focus.  The timeout room also ensured safety.  APS posted a timeout policy outside of the timeout room in Defendant Brady's classroom.  The policy provides that "[t]ime-out is a technique used to decrease severe inappropriate behavior.  Its purpose is to provide an opportunity for the student to regain control.  Time-out is not to be used arbitrarily or as a punishment."  During staff meetings, Defendant Brady and other staff agreed to use the timeout room "[i]f [Matthew] would become violent, a threat to himself or to others," or if Matthew exhibited "[a]ggressive behavior either to himself--when he would push or pull the desk toward him or crawl under it and grab the legs and shake them--or aggressiveness toward other children, moving toward them aggressively, growling at them while he was moving toward them." Defendant Brady testified that the timeout room was "never" used when Matthew refused to follow directions or do his work.  APS's own timeout record dated December 5, 2002, however, indicates that when Matthew was not "follow[ing] directions to begin work on Phonics one on one with [Ms. Brady]," "Ms. Orr and [Ms. Brady] escorted Matthew to the timeout room."

The techniques implemented before resorting to placement in the timeout room were not always documented.  Defendants maintain that each use of the timeout room was documented in a series of incident reports.  There is evidence, however, that a six-hour detention occurred, and

this detention is not reflected in the timeout records.  In the reports, Defendants did not record

every detail of Matthew's timeouts; the frequency of Matthew's aggressive behavior and the need

to teach other children while Matthew was in timeout precluded APS staff from reporting

anything more than a summary of the incidents.  Plaintiff did not receive a copy of these incident

reports until well after the placements in the timeout room occurred.  APS personnel did send

daily notes home with Matthew documenting his day and indicating whether timeouts were used.

Plaintiff first saw the timeout room when she was called by a teaching assistant to come

pick up Matthew, who had been in timeout for "something like six hours."  When Plaintiff "first

saw it, [she] was surprised . . . very surprised . . . shocked actually."  The room was "very small"

with "carpeting, but no padding on the walls," and with "[n]othing in it."  The room had a "very

dim light," and "black construction paper over the window" in the door, which had to be "moved"

or "t[aken] off" in order to see into the room.  When Plaintiff confronted Brady about the legality

of the timeout room and questioned whether the room complied with regulations, Brady stated

that they "d[idn't] have any regulations" and that she would have to "ask somebody about that."

Matthew referred to the timeout room as a "closet."

APS had, in fact, developed its own standards for the construction of timeout rooms, and

the structure of the timeout room in Defendant Brady's classroom complied with these standards.

The room was lighted and empty, the room did not have a lock on the door, and teaching staff

were able to see into the room through a shatter-proof window in the door.  APS staff, however,

forcibly restrained the door while Matthew was in the timeout room, thereby preventing Matthew

from leaving the room.  Matthew was not allowed to leave the room until he was able to be quiet

and calm for five minutes (referred to herein as the "five minute rule").  When he attempted to

leave the room without being quiet and calm, he was prevented from doing so.  APS staff also covered the small window in the door with black construction paper when Matthew used the window as a device to antagonize others despite the fact that APS teacher Diane Cook testified that for safety reasons teachers must have the windows to timeout rooms "clear."

A dispute of fact exists with respect to whether it is counter-productive to release a child from a timeout room before he or she deescalates, with Defendants arguing that it would have been counterproductive to release Matthew and Plaintiff arguing that it was counterproductive to keep Matthew in the timeout room.  In support of their argument, Defendants cite the opinion testimony of Diane Cook, a teacher at Governor Bent.  Ms. Cook, who has not been designated as an expert, testified that based upon her experience, if you release a student from the timeout room before he or she is "ready" and when the child is still "agitated," the "least little thing will agitate them even more so.  Usually, the outbreak will be more intense than the one that put them [sic] in time-out."  Ms. Cook also testified, however, that "it's obvious that when a child is in time-out a long time, that the intervention is not working.  So as a school, at that time, what I do, is try to call a parent and say, 'I don't want your child in time-out this long.'  But that doesn't always happen either, because we have parents who won't answer the phone or they're at work and they can't come get the child."  Ms. Cook explained that she has had students who are in "such an agitated state" that the student must go in and out of timeout, and "if [APS staff] could not get the parents, if [the staff] couldn't do something else, [the staff] really had no alternative, to keep other children safe and them safe."  Defendants also point out that the due process hearing officer quoted the testimony of Ms. Cook, in which Cook stated, "If a child is not calm, then you're going to be right back where you started before you put them in."  The hearing officer

also found, however, that Ms. Cook "credibly testified that judgment must be employed in determining when to let a child out of time-out," and that "[w]hen a child has been in the time-out room for an excessive period of time, an option is to call the parent to come pick up the child and take him home."

To demonstrate that it may be counter-productive to keep a child in a timeout room, Plaintiff cites the evidence contained in APS's own records of Matthew's timeouts. Construed in the light most favorable to Plaintiff, these records indicate that Matthew became more agitated and his behavior more intense the longer he was in timeout. For example, the timeout record on November 15, 2002, indicates that prior to being placed in the timeout room, "Matthew refuse[d] to do his spelling test. He threw his pencil into the back of the desk and started to walk forcefully, stomping feet, toward rest of class." APS staff physically removed Matthew from Defendant Brady's classroom to the timeout room (located within Brady's classroom) against Matthew's will, using a double-arm escort. After APS staff placed Matthew in timeout, he started "kicking the door," repeatedly cursing, "throwing his body up against the door," "spitting on the door," hitting his head, "acting violently, . . . wild and angry . . . like a wild animal," and "throwing himself against the walls and the door." Matthew was "violently banging the door open and shut," and APS staff reported that she had to "put all [of her] weight against the door," "putting [her] foot on the shelf in front of [her], which [would] allow[ her] to have more force when [she] lean[ed] against the door." On this occasion, APS staff, including Defendant Brady, chose to keep Matthew in the timeout room for one hour and thirty-five minutes, with the door barricaded shut, despite the fact that Matthew repeatedly begged to be released so that he could go to the bathroom. APS staff reported that Defendant Brady responded by saying, "if he's not

quiet, the time-out room will be his bathroom."

On November 26, 2002, prior to being placed in the timeout room in Defendant Brady's classroom, Matthew was not following directions, and was plugging his ears, giving angry looks, and arguing with and agitating his peers.  After being placed in the timeout room against his will, by use of a forcible double-arm escort, Matthew began repeatedly screaming and using profanity, threatening to kill APS staff, kicking the walls, kicking the door, hitting the door, pounding on the door, and hitting his head on the wall.  APS barricaded Matthew in the timeout room for forty-four minutes.  Later that same day, on November 26, 2002, Matthew was continuously talking and mimicking his peers while in Defendant Brady's classroom.  When APS staff asked him to take a timeout, Matthew refused; when APS staff attempted to force him into the timeout room in Defendant Brady's classroom, by using a double-arm escort, Matthew became angry and tried to run.  After being placed in the timeout room, Matthew began threatening to kill APS staff, informing staff that he had to go to the bathroom, and thereafter urinating on the carpet.  APS staff, including Defendant Brady, restrained Matthew for forty-two minutes, with the door to the timeout room opened during part of this detention.

Also on November 26, 2002, Matthew was placed in timeout at his desk in Defendant Brady's classroom, and when he tried to run, APS staff placed him in the timeout room with the door shut.  Thereafter, Matthew began urinating in the room, running around, kicking the walls, and throwing himself against the walls.

On December 4, 2002, prior to being placed in the timeout room in Defendant Brady's classroom, Matthew pulled his hat down over his eyes for a third time, and APS staff confiscated the hat.  Matthew attempted to retrieve the hat multiple times and kept screaming that he wanted

his hat back.  Matthew threw his backpack in the mud and began to strike APS staff.  After being

placed in the timeout room, with the door shut, Matthew began kicking the door.  He thereafter

remained quiet for five minutes.  When APS staff opened the door to ask Matthew whether he

was ready to leave, Matthew refused to answer.  APS staff informed Matthew that he needed to

answer when she spoke to him.  Because Matthew did not answer, APS staff decided to continue

to keep Matthew in the timeout room and closed the door to the room.  Matthew then was quiet

again for "at least five minutes," but he thereafter attempted to force the door open, so APS staff

chose once again to continue to restrain Matthew in the timeout room.  At one point during this

detention, Matthew remained quiet for four minutes and fifty seconds, when, during the last ten

seconds of his five-minute period, Matthew began yelling, "Let me out!  Let me out!  Let me

out!"  APS staff did not allow Matthew to leave the timeout room or open the door.  Matthew

continued to "desperately" beg APS staff, including Defendant Brady, to be released.  APS staff

restrained Matthew in the timeout room, with the door shut, for a total of one hour and forty-two

minutes on this occasion.

   Also on December 4, 2002, Defendant Brady and other APS staff forcibly placed Matthew

in the timeout room for failing to show APS staff what he was holding and for refusing to listen to

Defendant Brady, who told him to sit down and do his work.  As Brady and APS staff were

forcing Matthew into the room, Matthew yelled, "You will never control me."  Defendant Brady

replied, "[A]s long as you don't control your behavior someone has to."  On this occasion,

Matthew was able to comply with the five minute rule and was removed from the room after

approximately five minutes.

   On December 5, 2002, prior to being placed in the timeout room, Matthew was not

following directions to begin working on his phonics assignment.  As he was being physically placed in the timeout room, Matthew began struggling, trying to bite and grab the staff, and threatening the staff.  While in the timeout room, Matthew continued threatening the staff, and also began spitting, yelling, and throwing up.  APS staff, including Defendant Brady, restrained Matthew in the timeout room, with the door closed, for twenty-five minutes.[2]

Matthew was released from the timeout room whenever he remained quiet for five minutes.  Defendant Brady enforced this five minute rule and kept Matthew in the timeout room until he complied with the rule.  The timeout records indicate that on the vast majority of occasions Matthew was not able to remain quiet for five minutes and be removed from the timeout room at the expiration of five minutes.

## STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'"  *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted).  Under Rule 56©, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim.

---

[2] Only a portion of the timeout records are before the Court on Defendants' summary judgment motion.  The Court's description of Matthew's activities prior to and after each time he was placed in the timeout room, therefore, is not exhaustive.

*See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). "'Instead, the movant only bears the initial burden of 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo v. Neighborhood Health Centers, Inc.*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense. The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling

threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).  It provides immunity from

suit and not merely from liability.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  It

therefore spares defendants the burden of going forward with trial.  *See Wilson v. Meeks*, 52 F.3d

1547, 1552 (10th Cir. 1995) (citing *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989)).

Once a moving party raises the defense of qualified immunity, the nonmoving party must

(1) assert facts which, if true, would constitute a violation of a constitutional right, and (2)

demonstrate that the "right was clearly established at the time such that a reasonable person in the

[movant's] position would have known that [the] conduct violated the right."  *Garramone v.

Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*,

533 U.S. 194, 201-02 (2001).  If a nonmoving party fails to satisfy its two-part burden, a court

must grant the moving party qualified immunity.  *See Medina v. Cram*, 252 F.3d 1124, 1128

(10th Cir. 2001).  If the nonmoving party, however, successfully demonstrates the violation of a

clearly established right, the moving party assumes the normal summary judgment burden of

demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified

immunity.  *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992)

(citations omitted).

## DISCUSSION

First, Defendants Brady, Willis, and Flippo argue that the Court should dismiss Plaintiff's

42 U.S.C. Section 1983 Fourth Amendment claim on the grounds that Defendants did not violate

Matthew's Fourth Amendment rights and that Defendants are protected by qualified immunity.

Second, Defendants argue that the Court should dismiss Plaintiff's Section 1983 procedural due

process claim on the ground that Matthew was not deprived of a property right, or, if he was, he

received the process he was due.  Third, Defendants argue that the Court should dismiss

Plaintiff's Section 1983 substantive due process claim on the ground that the conduct underlying

this claim is covered by a more specific constitutional amendment.  Fourth, Defendants argue that

the Court should dismiss Plaintiff's supervisor liability claims on the grounds that Defendants

Willis and Flippo did not personally participate in the violation and that they are protected by

qualified immunity.  Finally, Defendants argue that the Court should dismiss Plaintiff's Section

1983 official capacity claims against them on the ground that official capacity claims are

essentially claims against the City of Albuquerque.  The Court will address each of these

arguments in turn.

I.      Section 1983 Fourth Amendment Seizure Claim.

        A.      Qualified Immunity.

                1.      Violation of a Constitutional Right.

        Plaintiff maintains that Defendants are not entitled to qualified immunity because they

violated Matthew's Fourth Amendment right to be free from unreasonable seizures.  *Garramone*,

94 F.3d at 1449 (once a defendant has raised the defense of qualified immunity, the nonmoving

party must assert facts which, if true, would constitute a violation of a constitutional right).

Defendants argue that "[b]ecause use of the time out room was an educational tool, it is not clear

that the Fourth Amendment is implicated at all."

        Applicable to the states through the Fourteenth Amendment's Due Process Clause, the

Fourth Amendment provides:   "The right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S.

Const. amend. IV.  Because the Amendment focuses on safeguarding persons from unwarranted

-13-

intrusion, and not on regulating the behavior of particular governmental actors, the prohibition against unreasonable seizures extends to civil, as well as criminal, detentions. *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) (rejecting the defendants' contention that the Fourth Amendment does not apply in the noncriminal and noninvestigatory context, and explaining that "The Fourth Amendment protects the right of the people to be 'secure in their persons' from government intrusion, whether the threat to privacy arises from a policeman or a Head Start Administrator" and that "[t]here is no 'social worker' exception to the Fourth Amendment") (citations omitted). The Supreme Court "has never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police" and "has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action.'" *T.L.O.*, 469 U.S. at 335; *id.* (it would be "'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior"). Consistent with this principle, the Supreme Court has held that school officials, "[i]n carrying out searches and other disciplinary functions . . . act as representatives of the State" and that "they cannot claim . . . immunity from the strictures of the Fourth Amendment." *Id.* at 336-37; *see also id.* at 337, 338-39, 341-42 & n.9 (noting that school officials have an interest in the "need for effective methods to deal with breaches of public order" and an "interest . . . in maintaining discipline in the classroom and on school grounds," but that this interest must be balanced against the individual's Fourth Amendment right to privacy and personal security). Other courts have also held that school officials in maintaining order and carrying out discipline are subject to the Fourth Amendment. *See*, *e.g.*, *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079-80 (5th Cir.

-14-

1995) (determining that the Fourth Amendment applied to school officials who detained student alone in room to maintain order and ensure safety); *Wallace v. The Batvia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995) (holding that the Fourth Amendment applied where school teacher seized student to prevent a fight, restore order, and discipline student); *Doe v. State of Hawaii Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003) (holding that school official who disciplined student to maintain order in the school was subject to Fourth Amendment scrutiny); *Rasmus v. State of Ariz.*, 939 F. Supp. 709, 715 (D. Ariz. 1996) (applying Fourth Amendment reasonableness analysis to find school officials' placement of student in timeout room unlawful); *Hayes v. Unified School Dist. 377*, 669 F. Supp. 1519, 1528 (D. Kan. 1987) (applying Fourth Amendment reasonableness analysis to determine whether school officials disciplining students by placing them in three-foot-by-five-foot timeout room acted unlawfully), *rev'd on other grounds*, 877 F.2d 809 (10th Cir. 1989); *Peters v. Rome City Sch. Dist.*, 747 N.Y.S.2d 867 (N.Y. Ct. App. 2002) (applying Fourth Amendment reasonableness analysis to find school officials liable for placing second grade student, who had engaged in inappropriate behavior, face-down on the floor and physically restraining him in a time-out room).

A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Courts base their Fourth Amendment analysis on the totality of the circumstances. *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) (citation omitted). The Tenth Circuit has instructed that "whether the person being questioned is a child or an adult" is "relevant" to the question whether a person would have felt free to leave. *United States v. Little*, 18 F.3d 1499, 1505 n.6 (10th Cir. 1994) (en banc); *see also Jones*, 410 F.3d at 1226 (in determining whether a

student detained at school was "seized," the court "must view [the student's] encounter . . .

through the eyes of a reasonable sixteen-year-old").

Seen from such a perspective, it is clear that a reasonable six-year-old student would not

have felt free to leave the timeout room.  APS staff, including Defendant Brady, physically forced

Matthew into the timeout room against his will, on numerous occasions, by using a double-arm

escort.  When Matthew attempted to open the door to the room, APS staff physically prevented

him from doing so.  When Matthew pleaded with Defendant Brady and her staff to release him,

they refused to do so.  On these facts, an emotionally-vulnerable six-year-old would not have felt

free to leave the timeout room.  *Cf. id.*  Matthew therefore was seized within the meaning of the

Fourth Amendment.

Having determined that the Fourth Amendment applies, the Court must next determine

whether to analyze the seizure under a relaxed Fourth Amendment standard.  "In determining

what limits the Constitution places on the investigative and disciplinary activities of school

authorities, the courts have always sought to accommodate both the interests protected by the

Constitution and the interests in providing a safe environment conducive to education in the

public schools."  *Edwards v. Rees*, 883 F.2d 882, 883-84 (10th Cir. 1989) (citing *New Jersey v.

T.L.O.*, 469 U.S. 325 (1985)).  "While students do not 'shed their constitutional rights at the

schoolhouse gate,' . . . the Supreme Court has never held that 'the full panoply of constitutional

rules applies with the same force and effect in the schoolhouse as it does in the enforcement of

criminal laws.'"  *Id.* (quoting *Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503,

506 (1969), and *T.L.O.*, 469 U.S. at 350 (Powell, J., concurring)).

In *New Jersey v. T.L.O.*, the Supreme Court applied a relaxed reasonableness standard to

-16-

determine whether a school search was unreasonable. *T.L.O.* involved the search of a student's purse by a school official who suspected the student of smoking on campus. The Court concluded that school officials are bound by the strictures of the Fourth Amendment, but concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the school does not require strict adherence to the requirement that searches be based on probable cause. . . . Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *T.L.O.*, 469 U.S. at 341. The *T.L.O.* Court held that a search of a student by a school official is reasonable if it is (1) justified at its inception, and (2) reasonably related in scope to the circumstances which first justified the seizure. *Id.* at 341. In *Edwards v. Rees*, the Tenth Circuit applied the *T.L.O.* relaxed standard for evaluating the reasonableness of searches to determine whether a school official seized a student in violation of the Fourth Amendment. 883 F.2d at 884 ("We believe that the same considerations which moved the Supreme Court to apply a relaxed Fourth Amendment standard in cases involving school searches support applying the same standard in school seizure cases.").

Plaintiff argues that the Court should not apply the relaxed standard set forth in *T.L.O.* and *Edwards*, and should instead apply a traditional Fourth Amendment analysis to determine whether Defendants' seizures violated Matthew's rights. In support of this argument, Plaintiff cites *Jones v. Hunt*, 410 F.3d at 1228, in which the Tenth Circuit concluded that "the case before [it did] not involve efforts by school administrators to preserve order on school property," and that it therefore "[did] not implicate the policy concerns addressed in *T.L.O.*" *Id.* Plaintiff maintains that the majority of Defendants' seizures did not concern the preservation of order but

rather involved power struggles with a six-year-old child, and that under *Jones*, Defendants should not be given the benefit of meeting a relaxed Fourth Amendment standard.  In so arguing, Plaintiff emphasizes the portion of the *Jones* opinion in which the Tenth Circuit found the relaxed standard inapplicable because the case did not involve "the preservation of order."  *Id.*  Plaintiff, however, ignores the fact that *Jones* court actually determined that the standard was inapplicable because the case did "not involve efforts by *school administrators* to preserve order on school property."  *Id.* (emphasis added).  In *Jones*, it was a police officer and a social worker from the sheriff's department, and not a school official, who seized the student.  *Id.* at 1224.  The Tenth Circuit held that the district court erroneously applied the relaxed standard established in *T.L.O.* because the seizure did not involve efforts by school administrators to preserve order on school property.  *Id.* at 1228.  The reasoning of *Jones*, therefore, is inapplicable here.

The relaxed Fourth Amendment inquiry set forth in *T.L.O.* asks a court to determine whether the seizures were justified at their inception.  The *T.L.O.* Court held that a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.  469 U.S. at 341-42.  In *Edwards*, the Tenth Circuit found the twenty-minute seizure of a middle school student by a school official justified at its inception where two other students made statements to the school official implicating the seized student in a bomb threat.  883 F.2d at 884.  In *Hayes v. Unified Sch. Dist No. 377*, 877 F.2d 809 (10th Cir. 1989), the Tenth Circuit, albeit in a different context, addressed a school's placement of sixteen-year-old students in a three-foot-by-five-foot timeout room, and held that the discipline of students, including placement in a timeout room, is a matter that relates

to public education and that the plaintiffs' claims therefore fell within the scope of the EHA.[3]  *Id.*
at 813.

Defendants maintain that these cases demonstrate that the placement of Matthew in the
timeout room was justified at its inception.  Plaintiff argues that the cases are distinguishable from
the instant case because of, among other things, Matthew's age, the length of his detention, and
the nature of his offenses.   Plaintiff also argues that *Hayes* is distinguishable because the court
only addressed timeout in the context of failure to exhaust administrative remedies and did not
give any "sanction to unbridled use of 'time out' for a six year old child."

Based upon *Hayes*, *Edwards*, and *T.L.O.*, the Court concludes that placement of a student
in a timeout room is not *per se* unlawful.  Rather, the Court must consider, under all of the
circumstances, whether Defendants' conduct was justified at its inception.  Plaintiff has failed, on
at least some occasions, to raise a question of fact with respect to whether placement in the
timeout room was justified at its inception.  For example, on December 4, 2002, prior to being
placed in the timeout room, Matthew was, among other things, striking APS staff.  Defendants'
placement of Matthew in the timeout room for the safety of himself or others was, on the facts
alleged by Plaintiff, justified at its inception.  On the other hand, on December 5, 2002, prior to
being placed in the timeout room, Matthew was not following directions to begin work on his

---

[3] In *Hayes*, the parties disputed whether the use of a timeout room was related to a
student's education to bring the conduct within the purview of Education of the Handicapped
Act's (precursor to the Individuals with Disabilities Education Act) exhaustion requirement.  *Id.*
at 813.  The Tenth Circuit reversed the district court's holding that the plaintiffs did not need to
exhaust their administrative remedies.  The Tenth Circuit determined that because placement in a
timeout room related to a student's education, and the EHA covered "any matter relating to . . .
the provision of a free appropriate public education," the EHA, and its exhaustion requirements,
were implicated.  *Id.*

phonics assignment.  The Court concludes that Plaintiff has raised a question of fact whether Defendants' placement of Matthew in the timeout room for failing to follow directions was justified at its inception.

Even if, on the facts alleged by Plaintiff, some of Defendants' seizures of Matthew were justified at their inception, Defendants are not entitled to qualified immunity with respect to those seizures because Plaintiff has set forth evidence indicating that the seizures were not reasonably related in scope to the initial justifications.  In *T.L.O.*, the Supreme Court explained that a search of a student by a school official is reasonably related in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction."  469 U.S. at 342.  On the facts alleged, Matthew's age, the length of his detentions, and the nature of his offenses, weigh against a finding of reasonableness.[4]

In *Edwards*, the Tenth Circuit held that a twenty-minute seizure of a middle school student in a school office was reasonably related in scope to the circumstances which initially justified the intrusion, *i.e.*, the suspicion that the student had called in a bomb threat.  883 F.2d at 884.  Here, in contrast, Defendant Brady and her assistants detained Matthew, a six-year-old child with emotional disabilities, for lengthy periods of time (up to one hour and forty-two minutes, based upon APS's own records, and approximately six hours, according to Plaintiff), in a "closet," for offenses that were, relatively speaking, significantly less serious than a bomb threat.  Indeed,

---

[4] *Cf. T.L.O.*,  469 U.S. at 342 (an action is reasonable in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction."); *Edwards*, 883 F.2d at 884 (considering length of detention and nature of threat in evaluating the reasonableness of a seizure).

on certain occasions, Brady and her assistants placed Matthew in the timeout room for not

following directions, giving angry looks, mimicking his peers, and continuously talking;[5] Brady's

assistants extended Matthew's detention even after Matthew complied with the five-minute rule,

for remaining silent after expiration of the five minute rule and refusing to answer a question on

one occasion and for trying to force a door open at the expiration of five minutes of silence on

another occasion.  The nature of these offenses by a six-year-old, first-grade student are not

similar in kind to an offense committed by a middle school student involving a bomb threat to a

school.[6]

   *Edwards* also is distinguishable based upon the number and length of the detentions.

_____

[5] Specifically, the detentions occurred when, among other things, "Matthew [did] not follow[] directions to begin work on Phonics"; when "Matthew refuse[d] to do his spelling test," "threw his pencil into the back of the desk," and "started to walk forcefully, stomping feet, toward rest of class"; when Matthew was not following directions, was plugging his ears, giving angry looks, and arguing with and agitating his peers; and when Matthew was continuously talking and mimicking his peers.

[6] Defendants cite several additional cases from other circuits, which also are distinguishable.  For example, in a Fourth Circuit case, the court held that holding a ten-year-old girl in the principal's office twice in two days so that school officials could investigate her classmates' allegations that she brought a firearm to school was reasonable.  *Wofford v. Evans*, 390 F.3d 318, 321 (4th Cir. 2004).  Like *Edwards*, however, *Wofford* is distinguishable based upon the seriousness of the offense (bringing a firearm to school), the age of the student (almost twice Matthew's age), and the type of detention room (principal's office versus closet).  The Fifth Circuit case, *Hassan v. Lubbock Ind. Sch. Dist.*, 55 F.3d 1075, 1080 (5th Cir. 1995), is distinguishable based upon the student's age (sixth grade), the nature of the infraction (misbehaving on a school field trip to a juvenile detention center where inmates were awaiting adjudication for criminal offenses), and the type of detention room (a larger room with a bed and toilet).  The Seventh Circuit case *Wallace v. Batavia Sch. Dist.*, 68 F.3d 1010, 1015, is distinguishable based upon the age of the student (sixteen years old), the nature of the offense (yelling obscenities and threatening to fight), and the type of intrusion (ordering the student to leave the classroom).  The Third Circuit case, *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 149 (3d Cir. 2005), is distinguishable based upon the age of the student (high school student), the nature of the offense (sexual misconduct), and the type of detention (an office and conference room).

Brady and her assistants detained Matthew, not on one, but on numerous, occasions for periods
of time much longer than twenty minutes.  Brady and her staff strictly employed the five minute
rule against Matthew.[7]  This proved difficult for Matthew, who, on the facts alleged by Plaintiff,
became increasingly distraught when initially placed and continually restrained in the timeout
room.  On some occasions, even when Matthew had been quiet for five minutes, Defendant Brady
and/or her staff did not release Matthew from the timeout room.  The detentions lasted up to one
hour and forty-two minutes, based upon APS's records (or six hours, based upon Plaintiff's
testimony), for conduct as minor as not following directions, even though placement in the
timeout room arguably exacerbated Matthew's problematic behavior and his emotional state.

For example, the detentions persisted even while Matthew was throwing his body against
the walls and door of the timeout room and hitting his head on the walls.  When Matthew would
try to escape from the timeout room, Defendant Brady's staff would forcibly restrain the door.
On one occasion, Brady's assistant noted that she was having to "put all [of her] weight against
the door," "putting [her] foot on the shelf in front of [her], which [would] allow[ her] to have
more force when [she] lean[ed] against the door."  Defendant Brady and her assistants chose to
keep Matthew barricaded in the timeout room for one hour and thirty-five minutes, despite the
fact that Matthew repeatedly begged Brady to release him from the room to go to the bathroom.
Defendant Brady's assistant reported that Brady told Matthew "if he's not quiet, the time-out
room will be his bathroom."  Although on some occasions, Matthew did, in fact, urinate on
himself while in the timeout room, Defendant Brady and/or her assistants did not release

---

[7] For example, when Matthew was quiet for four minutes and fifty seconds, but then spoke
during the last ten seconds, APS staff restarted the five-minute countdown, requiring Matthew to
remain quiet for an additional five-minute period.

Matthew.  On another occasion, Defendant Brady and/or her assistants did not release Matthew

even though he threw up and/or appeared to throw up in the timeout room.

 APS's timeout policy states that the purpose of the timeout room is to allow students to

regain control.[8]  On the facts alleged by Plaintiff, it appears that on most occasions Matthew had

greater control of himself prior to being placed in the timeout room than after being placed in the

timeout room.  APS's timeout policy also states that "[t]ime-out is a technique used to decrease

*severe inappropriate behavior. . . .*  Time-out is not to be used arbitrarily or as a punishment."

On the facts alleged by Plaintiff, Defendant Brady and her staff used timeout for failing to follow

directions, giving angry looks, mimicking peers, and continuously talking--conduct that cannot be

characterized as severe inappropriate behavior.  Defendant Brady and/or her staff also enforced

the five minute rule arbitrarily, strictly applying the rule against Matthew (so that when he spoke

with only ten seconds of silence left, the five-minute period started anew), but on other occasions

refusing to let Matthew out of the timeout room when he had complied with the rule and been

silent for five minutes (because of a minor infraction, such as remaining silent at the expiration of

five minutes when Brady's assistant asked Matthew whether he wanted to be released).

 On the facts alleged, this case also differs from *Edwards* because Matthew's detentions did

not occur in an office, but rather in a "very small," "closet"-like timeout room, with nothing in it,

no exterior window, dim light, and black construction paper over the window.  Although the

timeout room had no lock, Brady and/or her assistants forcibly restrained the door while Matthew

was in the timeout room, thereby preventing Matthew from leaving the room.  Such a room

---

 [8] Although Defendants used successful compliance with the five-minute rule as the test for
determining whether Matthew was calm and had regained control, the Court notes that a child
may be calm but not necessarily silent.

differs in kind from the closed school office used to detain a student in *Edwards*.

The Court cannot conclude, on the facts alleged by Plaintiff, that the detentions were reasonably related in scope to the conduct that initially justified the seizure.  For example, the Court cannot conclude that using physical force to barricade Matthew in a closet-like timeout room for one hour and thirty-five minutes, despite the fact that Matthew was growing increasingly distraught and his behavior increasingly severe, was reasonably related in scope to Matthew's original offense of refusing to do his spelling test, throwing his pencil into the back of his desk, and starting to walk forcefully toward the rest of the class.  The Court likewise cannot conclude that detaining Matthew in a timeout room, which was, for all practical purposes locked, for twenty-five minutes, despite the fact that Matthew was becoming increasingly distraught and his behavior increasingly severe, was reasonably related to Matthew's offense of "not follow[ing] directions to begin work on Phonics."   The Court also cannot conclude that continuing to restrain Matthew in the timeout room with the door effectively locked after he had been quiet and calm for five minutes (thereby complying with the five-minute rule), was reasonably related in scope to the offenses of refusing to answer the question of a teacher, trying to force the door open after five minutes of silence had elapsed, or talking after four minutes and fifty seconds of being calm and quiet.

The Court further notes that, on the facts alleged, Plaintiff has shown that the detentions taken cumulatively may not be reasonably related in scope to the circumstances first justifying them, *i.e.*, allowing Matthew to regain control and promoting safe behavior.  Assuming the facts are true, these detentions, as a whole, were not reasonably related in scope to the objectives of the initial seizures.

2.      Clearly Established Right.

Although Defendants' alleged actions, if true, violated Matthew's Fourth Amendment rights, Defendants nonetheless gain qualified immunity if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Defendants maintain that the law is not clearly established that placement in a timeout room could be a constitutional violation.

The Supreme Court has explained that "'the right the [officials are] alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)). To defeat a claim of qualified immunity, however, Plaintiff need not point to a prior holding that the specific conduct at issue is unlawful; rather, the unlawfulness of the alleged action must have been apparent. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Moreover, it is incumbent upon government officials to make "reasonable applications of the prevailing law to their own circumstances." *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999).

Without a doubt, it was clearly established by October 2002 that a seizure must be reasonable. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *Jones*, 410 F.3d at 1229. In *Terry*, decided in 1968, the Supreme Court instituted the rule that, at minimum, a seizure must be justified at its inception and reasonably related in scope to the circumstances which justified the interference in the first place. 392 U.S. at 20; *cf. Jones*, 410 U.S. at 1229. It was also clearly established by October 2002 that the Fourth Amendment's strictures apply to

school officials. *T.L.O.*, 469 U.S. at 7341-42; *Edwards*, 883 F.2d at 884; *cf. Jones*, 410 F.3d at 1229-30. As described above, the Supreme Court in *T.L.O.*, held that a school official may violate the Fourth Amendment if the official unreasonably searches a student. And, the Tenth Circuit in *Edwards* held that school officials may violate the Fourth Amendment if they unreasonably seize a student for committing offenses against school rules or the law. 883 F.3d at 884. Moreover, the standard by which a court determines whether a seizure occurred was clearly established by October 2002. *Cf. Jones*, 410 F.3d at 1230.

Therefore, by October 2002, Defendants were on notice that the Fourth Amendment requirements applied to them, that a seizure would occur within the meaning of the Fourth Amendment if at any point the student believed he or she was not free to terminate an encounter, and that the seizure of a child at a public school must be justified at its inception and reasonably related in scope to the circumstances which justified the interference in the first place. *Cf. id.* at 1228 ("we have held since 1989 that seizures of students by school officials must pass the *Terry* test"); *id.* at 1229-30 (a reasonable social worker seizing a student on school property should have known that his conduct violated the student's rights because it was clearly established that a seizure must be justified at its inception and reasonably related in scope to the circumstances which first justified the seizure and that the Fourth Amendment's strictures apply to social workers). Because the law was clearly established in October 2002 such that a reasonable school official in Defendants' position would have known that the alleged conduct violated Matthew's Fourth Amendment rights, the Court denies Defendants' motion for summary judgment on the Fourth Amendment claim on the grounds of qualified immunity.

     B.     <u>Summary Judgment On the Merits</u>.

Defendants also argue that they are entitled to summary judgment on the merits of Plaintiff's unlawful seizure claim. The Court concludes that, for the reasons stated above, Plaintiff has raised a factual question with respect to whether Defendants seized Matthew in violation of the Fourth Amendment. Defendants therefore are not entitled to summary judgment in their favor.

II.   <u>Section 1983 Fourteenth Amendment Procedural Due Process Claim</u>.

Defendants argue that Plaintiff cannot state a claim for violation of Matthew's constitutional right to procedural due process on the facts construed in her favor.[9]  The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV. The Supreme Court has held that "[a]n essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1984) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). In determining whether an individual has been deprived of a right to

---

[9] Defendants argue that they are entitled to summary judgment on Plaintiff's procedural due process claim because the due process hearing officer already "considered the appropriateness of time outs as an educational method, and determined that time outs were used appropriately." A state administrative law judge's conclusions, however, are not necessarily determinative of the question whether there was a violation of the federal Constitution. *Cf. Martinez v. New Mexico State Engineer Office*, 129 N.M. 413, 420, 9 P.3d 657, 664 (N.M. 2000). In addition, contrary to APS's representation, the hearing officer did not find that Matthew's placements in the timeout room were per se appropriate. The hearing officer simply found that "the district reasonably, appropriately, and professionally monitored and documented the student's time-out incidents." The hearing officer also found that APS teacher Diane Cook's testified credibly that judgment must be employed in determining when to let a child out of timeout, that if a teacher releases a child who is not "calm" (Ms. Cook did not endorse the five-minute silence rule and instead used the word "calm") "you're going to be right back where you started before you put them in," and that when "a child has been in the time-out room for an excessive period of time, an option is to call the parent to come pick up the child and take him home."

procedural due process, a court must determine (1) whether the individual possess a protected property interest such that due process protections were applicable, and if so, (2) whether the individual was afforded an appropriate level of process. *Id.* at 541; *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994).

Although "the full panoply of constitutional rules" does not apply "with the same force and effect in the schoolhouse as it does in the enforcement of criminal laws," *Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 506 (1969); *T.L.O.*, 469 U.S. at 350 (Powell, J., concurring), the Supreme Court has determined that school officials must provide procedural due process protections to students prior to excluding them from the educational process. *Goss v. Lopez*, 419 U.S. 565, 576 (1975) ("'education is perhaps the most important function of state and local governments,'. . . and the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child"). With respect to what process is due, the Supreme Court has held, "Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. The Court explained, "There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is

accused of doing and what the basis of the accusation is."[10]  *Id.* at 582.

Defendants argue that there was no deprivation of a property interest on the ground that timeout was a component of Matthew's education.  Although the Supreme Court specifically declared that "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause," *id.* at 574, the Court has also stated that where an interference with a student's property interest is *de minimis*, due process procedures are not invoked, *Ingraham v. Wright*, 430 U.S. 651, 674 (1977); *Goss*, 419 U.S. at 576.

The issue presented, then, is whether forcibly placing and detaining Matthew in the timeout room constitutes "the total exclusion from the educational process for more than a trivial period," *id.*, or whether it amounts to no more than a *de minimis* interference, *see, e.g.*, *Fenton v. Stear*, 423 F. Supp. 767 (W.D. Pa. 1976) (*de minimis* interference where school forced a high-school student to remain (supervised) in a detention hall instead of joining a class sightseeing trip where student was required to do school work during the detention).  The Court concludes, that on the facts construed in Plaintiff's favor, Plaintiff has set forth evidence supporting a constitutional violation.  Although certainly not all placements in a timeout room would constitute a total exclusion from the educational process, the detentions here, on the facts construed in Plaintiff's favor, totally excluded Matthew from the education process for more than a trivial

---

[10] Defendants' argument that Plaintiff's procedural due process claim must fail because she "had a post deprivation remedy" before the due process hearing officer is not persuasive.  Under *Goss*, once procedural due process protections are triggered, a student is entitled to notice of the charges against him *prior* to being deprived of his or her right to participate in the educational process.

period.  Specifically, Plaintiff presented evidence that Matthew did not do any school work while in the timeout room. Even though Defendants argue that the timeout room was a necessary component of Matthew's education because it allowed him to regain control and focus on his school work, the Court already has concluded that Plaintiff presented facts that would support a conclusion that placement in the timeout room exacerbated his behavior and was counterproductive to encouraging Matthew to focus on his school work.  Furthermore, the evidence indicates that over the course of approximately two and one-half months, Defendants placed Matthew in the timeout room 21 times for a total of approximately twelve hours.  While any single placement in the timeout room may have been *de minimis*, in total, these placements, on the facts construed in Plaintiff's favor, constituted an exclusion from the education process that was more than trivial.

Defendants cite two timeout cases in support of their argument that Matthew's deprivation was *de minimis*.  In *Dickens v. Johnson Co. Board of Education*, 661 F. Supp. 155 (E.D. Tenn. 1987), the state court found the interference of being placed in a five-foot-by-seven-foot "timeout box" in the corner of a classroom (in which the sixth-grade student could hear was going on and sometimes see the teacher) *de minimis* where the student was "permitted to remain in the classroom; encouraged to perform class work; . . . allowed to attend all his classes, including those in other parts of the school," and "was not expelled, suspended, . . . totally excluded[,] . . . physically restrained, nor . . . subjected to physical pain." *Id.* at 158.  Although the student was placed in the timeout box for four and one-half hours one time, he was allowed to leave the timeout box to go to the bathroom, to attend classes in other areas of the school, such as reading and physical education, and to eat lunch in the cafeteria.  *Id.* at 156-57.  In *Robert H. v.*

*Nixa R-2 School District*, No. 94-3496-CV-S-RGC, Decision, (W.D. Mo. Aug. 9, 1997)

(attached as Exh. I to Defs' Mem. in Supp. of Mot. for Summ. J.), the Judge/Administrative

Officer found that placement of an eighth-grade student in a timeout room for twenty minutes on

two occasions and parts of "5th and 6th hour" on another occasion *de minimis* where the

student's IEP specifically approved the use of a timeout *room* (and not "supervised time-out,"

which was approved in Matthew's IEP) and where the student was able to "work without

distraction" in the room.

 These cases are distinguishable. First, the school officials in *Dickens* and *Robert H.*

required the students to do school work while in the timeout room/box. Indeed, in *Dickens*, the

student attended classes while in the timeout box. Accordingly, the students were not totally

excluded from the educational process in either case. Second, in *Dickens*, the court specifically

considered, in deciding whether the deprivation was *de minimis*, the fact that the student was not

physically restrained, was not in pain, and was allowed to leave the box to go to the bathroom and

eat lunch. Third, the students in *Dickens* and *Robert H.* were significantly older than Matthew

(sixth and eighth grade). Finally, there was no evidence that the students in *Dickens* and *Robert

H.* were in an emotional frenzy while in the timeout room/box. Because the facts of these cases

are not similar to the facts of this case, the Court is not persuaded that Matthew's deprivation was

*de minimis*.

 Defendants next argue that even if Defendants did deprive Matthew of a property interest,

Defendants gave Matthew all of the process he was due. On the facts construed in Plaintiff's

favor, however, it does not appear that Matthew was given notice and an opportunity to be heard

prior to being placed in the timeout room. The Court therefore denies Defendants' motion for

-31-

summary judgment on Plaintiff's procedural due process claim.

III.    Section 1983 Fourteenth Amendment Substantive Due Process Claim.

Defendants maintain that the Court should dismiss Plaintiff's Section 1983 substantive due

process claim because the Supreme Court has held that when a plaintiff alleges a constitutional

claim covered by a specific constitutional provision, a court should analyze the claim under that

specific provision instead of under the rubric of substantive due process.  *Graham v. Connor*, 490

U.S. 386, 394 (1989); *see also United States v. Banier*, 520 U.S. 259, 272 n.7 (1997) ("*Graham*

simply requires that if a constitutional claim is covered by a specific constitutional provision, such

as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate

to that specific provision, not under the rubric of substantive due process.").  Plaintiff does not

dispute Defendants' contention or otherwise argue that her substantive due process claim should

survive Defendants' motion for summary judgment.[11]  Because the Court has held that the same

conduct alleged by Plaintiff as a violation of substantive due process is covered by the Fourth

Amendment's prohibition against unreasonable seizures, the Court dismisses Plaintiff's

substantive due process claims against Defendants Brady, Flippo, and Willis.[12]

---

[11] Instead, Plaintiff maintains that the Court should ignore Defendants' arguments because Defendants have moved only for summary judgment on the ground of qualified immunity. Although Defendants' motion is entitled, "Motion for Summary Judgment on Grounds of Qualified Immunity for Defendants Brady, Willis & Flippo, the body of the motion states that Defendants seek summary judgment on the ground that Plaintiff has failed to state a constitutional violation and on the ground that Defendants are immune.

[12] If the Court had concluded that Matthew was not "seized" within the meaning of the Fourth Amendment, the facts underlying Plaintiff's substantive due process claim would not have been covered by a more specific constitutional provision, and the claim would have survived.  *Cf. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (evaluating substantive due process claim after concluding that plaintiff was not seized for purposes of the Fourth Amendment because "[s]ubstantive due process analysis is appropriate in cases that involve excessive force

-32-

IV.   <u>Section 1983 Supervisor Liability Claim</u>.

Defendants argue, "If Plaintiff cannot state a claim for a constitutional violation, then there cannot be supervisor liability because a supervisor must personally participate in the violation." Because the Court has held that Plaintiff has alleged facts that support a Fourth Amendment claim for a violation of the right to be free from unreasonable seizure and a Fourteenth Amendment claim for a violation of the right to procedural due process, the Court disregards this argument. Defendants also argue, in the alternative, that even if the Court determines that Plaintiff has stated a claim for a constitutional violation, Defendants Willis and Flippo are entitled to qualified immunity from Plaintiff's supervisory liability claims against them for the same reasons Defendant Brady was entitled to qualified immunity.  The Court already has held, however, that Defendant Brady is not entitled to qualified immunity, and therefore Defendants' motion for summary judgment on the same grounds must fail.

V.   <u>Section 1983 Official Capacity Claim</u>.

Defendants maintain that the Court should dismiss Plaintiff's official capacity claim against them because these claims are an action against the City of Albuquerque.  In support of this confusing argument, which is set forth in a two short paragraphs, Defendants cite Supreme Court precedent standing for the proposition that a suit against an official in his or her official capacity is a suit against the City of Albuquerque.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  These cases, however, do not stand for the proposition that because official capacity suits are essentially suits against the entity, a court should dismiss the

_____

where a specific constitutional provision - such as the Fourth or Eighth Amendment - does not apply").

official capacity claims.  And, Defendants do not offer any explanation as to why the proposition

that official capacity claims are essentially claims against the entity would render Plaintiff's official

capacity claims subject to dismissal.[13]  The Court therefore denies Defendants' motion for

summary judgment on Plaintiff's official capacity claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, **IT THEREFORE IS ORDERED** that the Motion for

Summary Judgment on Grounds of Qualified Immunity for Defendants Brady, Willis & Flippo,

filed May 1, 2006, **[Doc. No. 29]**, is hereby **GRANTED IN PART** as follows:

(1)    Defendants' Motion for Summary Judgment on Plaintiff's 42 U.S.C. Section 1983

claim for violation of Matthew's right to substantive due process under the Fourteenth

Amendment is GRANTED;

(2)    Defendants' Motion for Summary Judgment on Plaintiff's remaining claims is

DENIED.

Dated this 15th day of May 2007.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE

---

[13] If the Plaintiff's claims against APS were dismissed, Plaintiff's official capacity claims
would be likewise dismissed pursuant to the holdings in *Hafer v. Melo* and *Kentucky v. Graham*.