# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JENNIFER COUTURE, individually
and as mother and next friend of M.C.,
a minor child,

        Plaintiff,

                                              Civ. No. 05-972 JCH/DJS

vs.

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,
ELIZABETH EVERITT, in her individual
and official capacity, DEBI HINES, in
her individual and official capacity, PAT
WILLIS,  in her individual and official
capacity, JOE FLIPPO, in his individual
and official capacity, and JACQUELINE
BRADY, in her individual and official
capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Partial Summary

Judgment and Memorandum in Support, filed November 1, 2006, **[Doc. No. 99]**, and Defendant

APS's Motion for Summary Judgment on Plaintiff's Section 1983 Claims, filed November 1,

2006, **[Doc. No. 94]**.  The Court, having considered the motions, arguments of counsel, evidence,

and relevant law, and being otherwise fully informed, finds that Plaintiff's Motion for Partial

Summary Judgment and Memorandum in Support is denied and that Defendant APS's Motion for

Summary Judgment on Plaintiff's Section 1983 Claims is granted in part and denied in part.

# BACKGROUND.[1]

From October 28, 2002, to January 9, 2003, Matthew attended Governor Bent Elementary School, in a classroom, taught by Defendant Jacqueline Brady. Defendant Brady's classroom was comprised of first, second, and third grade students with the disability of "emotional disturbance." Matthew was six years old while he was in Defendant Brady's class.

Defendant Brady replaced a teacher who had resigned. Because Brady had not completed some special education classes, APS requested a temporary license for Brady, which the Public Education Department granted.

Matthew had a history of problems at school. Matthew was expelled from his private preschool for misbehavior that included threatening other children, hitting other children, yelling at children and staff, and slapping his teacher in the face. Before being placed in Defendant Brady's class, Matthew frequently argued with other students and with teaching staff, grabbed a teacher, threatened other students, kicked another student, pinned another student against the cafeteria window, hit a student, broke pencils, repeatedly defied directives from his teacher, and constantly disrupted instruction.

While in Defendant Brady's class, Matthew consistently was disruptive and angry. At one point, Plaintiff reported that Matthew was having seven to ten tantrums at school daily, most of which were maximum intensity and lasted from ten minutes to one hour. Matthew hit and kicked his desk daily and approached other children aggressively. Matthew regularly threatened teachers and other students. Matthew would yell, "You're dead. I'm going to kill you. I'm going to

---

[1] The following facts are either undisputed (for the purposes of this motion) or construed in the light most favorable to the party opposing summary judgment.

-2-

throw hot oil on you and a match and gasoline," or "F*** you.  F*** you, you f***ing sons of b******.  You b******.  I'm going to kill you.  I'm going to throw cat guts and blood on you." Matthew also punched Defendant Brady's educational assistant in the stomach once, tried (and often succeeded) to kick her daily, and spit on her.

Before Matthew began attending Governor Bent, Plaintiff signed an Individualized Education Program (IEP) developed on October 16, 2002, which specified "supervised time out" (but not use of a timeout room), "therapeutic de-escalation," and "a behavior management system involving clear rules with consistent implementation of consequences."  A Behavioral Intervention Plan (BIP) prepared on December 17, 2002, also indicated that Matthew would be placed in "time out if he loses control and if he threatens to hurt self or others."  Defendants have not presented evidence that Plaintiff specifically authorized use of a timeout room.

During the time when Matthew attended Governor Bent, timeout rooms were only located within two "ED" classrooms, *i.e.*, Defendant Brady's classroom and Diane Cook's classroom. Ms. Cook's classroom, like Defendant Brady's classroom, was for children with emotional disabilities.  Timeout rooms were not in any other classrooms at Governor Bent; the rooms were developed and used only for emotionally disturbed children.

There were written time-out policies posted outside of the door to the timeout room in Defendant Brady's classroom.  Specifically, the policies were comprised of the "Standards for Use of Time-Out," and "Best Practice Use of Restraint for Students with Disabilities" ("Best Practice Use of Restraint").  APS admits that "[it] adopted a time out policy in conformity with the State's guidance."  Mem. Br. in Supp. of Summ. J. for Brady, Willis & Flippo, p. 10; *see also* APS's Mem. Br. in Supp. of Summ. J. on Pl's Section 1983 Claims, po. 17 (admitting that the "APS

special education department issued written guidelines to teachers providing guidance on the use

of time out rooms"). APS also admits that the Standards for Use of Time-Out and Best Practice

Use of Restraint constituted this policy. *See id.*, exh. D. In addition, Defendant Willis, the

principal of Governor Bent, testified that the school had a written policy from APS on timeout

and physical restraints.

The Standards for Use of Time-Out indicate that they apply to "all district personnel who

routinely interact with students with disabilities." The policies govern the "use of time-out as it

pertains to students with disabilities." The stated purpose of the policies is "to insure safe,

consistent and appropriate use of time-out throughout the district, to provide a definition of time-

out and to outline procedures for its use that will allow for the maintenance of dignity and respect

for all students." The Standards for Use further indicate that, with respect to "monitoring

responsibility," the "site administrator will monitor all provisions of these standards." Defendant

Principal Willis indicated that she was the site administrator at Governor Bent, and that she was

the supervisor of the school and the ED classrooms in the school. The Standards for Use of

Time-Out specifically contemplate that APS personnel will use timeout rooms and provide

guidance to staff with respect to how to implement timeout. The Standards for Use indicate that

a timeout room "must be specifically designed for the purpose of time-out," and further sets forth

the requirements for such a room.

The Best Practice Use of Restraint, quoting APS Board Policy G-4, provides that "a staff

member may use physical force to restrain or remove a person when it is essential for self-defense

or for the protection of the individual, other persons or property, or if the person is unreasonably

defiant or aggression that may cause harm to self or others." The Best Practice Use of Restraint

statement is "intended to provide guidelines for the use of physical restraint/management for students with disabilities that will allow for the maintenance of dignity and respect for all students."  The definition of physical restraint includes "any means of attempting to control, teach or otherwise manage a student through the restriction of movement."  Such restraint may be used "when a student's behavior is dangerous to self or others or results in property damage likely to result in harm to self or others."

The APS Standards for Use of Time-Out require that staff document each incident of timeout, including the date, name of student, and reason, and duration of time-out.  APS employees Wendy Orr, Sarah Thompson, and Defendant Brady described their detentions of Matthew in the timeout room between October 28, 2002, and January 9, 2003, in hand written notes.  Defendant Principal Willis, site administrator, reviewed the incident reports and discussed them with Defendant Brady; this review was consistent with the requirement in the Standards for Use of Time-Out that the site administrator monitor the use of timeout.  The Court incorporates by reference its summary of Matthew's placement in the timeout room contained in the handwritten notes (also referred to as timeout records) before the Court on the Motion for Summary Judgment of Defendants Brady, Flippo, and Willis.  *See* Mem. Op. & Order deciding Motion for Summary Judgment on Grounds of Qualified Immunity for Defendants Brady, Willis & Flippo, filed of even date herewith.  APS did not provide Plaintiff with a copy of these notes until the winter of 2005, before the due process hearing which took place in March of 2005.  Plaintiff did not ask to review the notes prior to her request to do so for the due process hearing.

Based upon their handwritten notes,[2] APS employees placed Matthew in the timeout room at least 21 times from October 28, 2002, to January 9, 2003. Matthew spent more than twelve hours in the timeout room from October 28, 2002, to January 9, 2003. The lengths of the detentions described in the handwritten notes were five minutes on October 28, 2002, one and one-half hours on October 31, 2002, fifteen minutes on November 1, 2002, thirteen minutes and then eighteen minutes on November 14, 2002, one hour and 35 minutes and then one hour and four minutes on November 15, 2002, thirteen to eighteen minutes, and then fifteen minutes on November 25, 2002, forty to fifty minutes and then one hour and nine minutes on November 26, 2002, twelve minutes on November 27, 2002, one hour and 45 minutes and then five minutes on November 4, 2002, 25 minutes on December 5, 2002, fifteen minutes and then one hour and 50 minutes on December 11, 2002, 45 minutes on December 12, 2002, and an indeterminate amount of time on January 9, 2003. APS admits that, at times, Matthew did not voluntarily go to or voluntarily remain in the timeout room.

Defendant Brady testified that no one ever told her that the use of the timeout room for Matthew was problematic. Brady understood it was "approved" by her mentor teacher, Ms. Cook, and the principal, who was the site supervisor. The district school psychologist testified that "usually what you do in time-out" is to hold a child in the room against his or her will by keeping the door shut. The psychologist further testified that holding the door shut is what you do to "comply with the parameters of time-out."

---

[2] Plaintiff maintains that on one occasion Defendants kept Matthew in timeout for approximately six hours. For purposes of Defendants' motion for summary judgment only, however, Plaintiff assumes that the handwritten notes by APS employees of Matthew's timeouts accurately reflect the number and length of times Matthew was placed in the timeout room.

## STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56©, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant will not bear the burden of proof at trial, this burden may be met by pointing to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). "Where the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  If

there is no genuine issue of material fact in dispute, then a court must next determine whether the

movant is entitled to judgment in its favor as a matter of law.  *See, e.g.*, *Jenkins v. Wood*, 81 F.3d

988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## <u>DISCUSSION</u>

Plaintiff and Defendant APS filed cross-motions for summary judgment on Plaintiff's 42

U.S.C. Section 1983 municipal liability claims.  In her motion, Plaintiff maintains she is entitled to

judgment in her favor on her Fourth Amendment unlawful seizure claim because APS had an

official policy, practice custom, or practice regarding the use of timeout rooms that was the

moving force behind the violation of Matthew's Fourth Amendment right to be free from unlawful

seizures.  Plaintiff also argues that she is entitled to summary judgment on her Fourteenth

Amendment equal protection claim because APS had a policy, practice, or custom of using

timeout rooms for emotionally disabled students that was the moving force behind a violation of

Matthew's right to equal protection under the law.  In its motion, Defendant APS maintains that it

is entitled to summary judgment on Plaintiff's municipal capacity claims because she cannot

establish that a deprivation of Matthew's constitutional rights was caused by an APS policy,

practice, or custom.

I.      <u>Plaintiff's Motion for Summary Judgment</u>.

      A.      <u>Fourth Amendment Unlawful Seizure Claim</u>.

Plaintiff argues that she is entitled to judgment in her favor on her Fourth Amendment

unlawful seizure claim.   As a threshold matter, Defendant maintains that the Court should deny

Plaintiff's motion for summary judgment on this claim because the claim directly contradicts the First Amended Complaint. According to Defendant, Plaintiff's Fourth Amendment claim is based upon APS's failure to enact any policy regarding timeout rooms. Defendant contends that Plaintiff cannot argue at the outset that APS is liable for having no policy and then argue on summary judgment, without seeking leave to amend the complaint, that APS has an official policy regarding timeout rooms. The First Amended Complaint, however, does not allege a failure by APS to adopt a policy with respect to timeout rooms, but rather a failure by APS to adopt an *appropriate* policy regarding timeout rooms. Accordingly, Defendant's argument does not have merit.

A municipality such as the City of Albuquerque is not immune from a Section 1983 suit. In *Monell v. New York City Department of Social Services*, the Supreme Court held that municipalities and other local governmental bodies are "persons" within the meaning of Section 1983. *See* 436 U.S. 658, 689 (1978). Although courts can impose civil liability on municipalities for their own illegal acts, the Supreme Court repeatedly has refused to hold municipalities liable for the tortious acts of their employees under a theory of *respondeat superior*. *See, e.g.*, *id.*; *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted). The Supreme Court has concluded that municipalities can be held liable only when an injury is inflicted by the government's "'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988) (quoting *Monell*, 436 U.S. at 694). The Court explained that requiring a plaintiff to "[l]ocat[e] a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the

municipality." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) (citation omitted). "[T]he touchstone for determining official policy is distinguishing acts of the municipality from acts of employees of the municipality, and thereby making clear that municipal liability is limited to action for which the municipality is actually responsible." *Melton v. City of Oklahoma City*, 879 F.2d 706, 723 (10th Cir. 1989) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)), *rev'd in part on other grounds*, 928 F.2d 920 (10th Cir. 1991).

Although Defendant APS maintains that Plaintiff has not presented evidence establishing the existence of an official policy, practice, or custom, the "Standards for Use of Time-Out," and "Best Practice Use of Restraint for Students with Disabilities" constitutes evidence of an official policy sanctioning the use of timeout rooms. These policies and practices were posted outside of Defendant Brady's timeout room. APS itself concedes that "APS adopted a time out policy in conformity with the State's guidance," and Defendant Principal Willis testified that the school did have a written policy from APS on timeout and physical restraint. The Standards for Use of Time-Out specifically provide that they are applicable to "all *district* personnel who routinely interact with students with disabilities." (Emphasis added.) The stated purpose of the policies is "to insure safe, consistent and appropriate use of time-out *throughout the district*, to provide a definition of time-out and to outline procedures for its use that will allow for the maintenance of dignity and respect for all students." (Emphasis added.) As required by the APS timeout policy, Defendant Brady and her staff documented each use of the timeout room. As also required, Defendant Willis reviewed each of the incident reports prepared by Brady and her staff. APS states in conclusory fashion that the Standards for Use of Time-Out and the Best Practice Use of Restraint are not the City of Albuquerque's official policy. APS, however, does not identify a

single fact establishing that these documents do not represent official policy.  Defendant APS's

argument, therefore, is not a basis for denying Plaintiff's motion for summary judgment.[3]

Defendants next argue that the Court should deny Plaintiff's summary judgment motion on

her Fourth Amendment unlawful seizure claim on the ground that Plaintiff cannot establish, on the

facts construed in APS's favor, an underlying constitutional violation.  The Court already has

denied Defendants' motion for summary judgment on the unlawful seizure claim, *see* Mem. Op. &

Order filed deciding Motion for Summary Judgment on Grounds of Qualified Immunity for

Defendants Brady, Willis & Flippo, filed on even date herewith, concluding that because Plaintiff

had alleged facts sufficient to state a constitutional violation, Defendants were not entitled to

qualified immunity or judgment in their favor.  In evaluating Plaintiff's motion for judgment on the

unlawful seizure claim, however, the Court must construe the facts in Defendant APS's favor.

Although APS's detailed and extensive timeout records indicate that several of Matthew's

---

[3] Defendant APS also argues that Plaintiff has not set forth evidence establishing a practice or custom capable of rendering APS liable for its employee's use of the timeout room.  If an alleged violation "cannot be characterized as official policy then [a city] can still be held liable if the practice is 'so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (citation omitted).  "In order to establish a custom, the actions must be 'persistent and widespread . . . practices of city officials.'"  *Id.* (citation omitted).  Plaintiff has set forth evidence that APS officials detained Matthew in the timeout room 21 times over two and one-half months, that Defendant Principal Willis reviewed the incident reports, that Defendant Willis and Defendant Brady's mentor teacher approved the use of the timeout room, that the district school psychologist was aware of the use of timeout rooms, that the district psychologist testified that timeout usually results in holding a child in a timeout room against his or her will, that APS specifically constructed a timeout room in one of the two ED classrooms at Governor Bent, that no one told Defendant Brady that the use of the timeout room for Matthew was problematic, and that APS's policies contemplated the use of a timeout room.  Because the Court already has held that Plaintiff has identified at least one official policy regarding the use of timeout rooms, the Court does not reach the question whether Plaintiff has set forth evidence of a practice or custom sufficient to hold APS liable for an underlying constitutional violation.

detentions were not reasonably related in scope to the circumstances first justifying them, APS has pointed to the testimony of APS staff indicating that the timeout room was only used when Matthew was a harm to himself or others. Although not overwhelming, this evidence is sufficient to allow Defendant APS to withstand summary judgment.[4] The evidence raises a material question of fact whether use of the timeout room was justified at its inception and whether the detentions were reasonably related in scope to the circumstances first justifying them. The Court, therefore, cannot grant Plaintiff's motion for summary judgment.

      B.    <u>Fourteenth Amendment Equal Protection Claim</u>.

Plaintiff argues that she is entitled to summary judgment on her Fourteenth Amendment equal protection claim because APS had a policy, practice, or custom of using timeout rooms for emotionally disabled students and that that custom was the moving force behind a violation of Matthew's right to equal protection under the law. During the time when Matthew attended Governor Bent, timeout rooms were only located within two "ED" classrooms, Defendant Brady's classroom and Diane Cook's classroom. Ms. Cook's classroom, like Defendant Brady's

---

[4] Defendant APS also maintains that the Court is bound by the findings of the due process hearing officer, who, according to APS, found that the disciplinary interventions implemented by Ms. Brady and her classroom staff were reasonable and that their use of the timeout room was appropriate. The Court may review the hearing officer's factual findings but should give the findings "due weight." Contrary to APS's representation, the hearing officer did not find that Matthew's placements in the timeout room were per se reasonable and appropriate, that Defendant Brady only used the timeout room to deescalate Matthew's behavior when he became violent or a threat to himself or others, or that a teacher should never release a child from timeout unless the child is silent for five minutes. The hearing officer simply held that APS teacher Diane Cook's testified credibly that judgment must be employed in determining when to let a child out of timeout, that if a teacher releases a child who is not "calm" (Ms. Cook did not endorse the five-minute silence rule and instead used the word "calm") "you're going to be right back where you started before you put them in," and that when "a child has been in the time-out room for an excessive period of time, an option is to call the parent to come pick up the child and take him home."

classroom, was for children with emotional disabilities.  Timeout rooms were not in any other

classrooms at Governor Bent; the rooms were developed and used only for emotionally disturbed

children.  Plaintiff argues that, by "reason of common sense," other students at Governor Bent

refused to work, mimicked other students, and gave angry looks.  School officials, however, in

response to this conduct, only used the timeout rooms for Matthew and not these other students.

Plaintiff maintains that this differential treatment violates the Equal Protection Clause.

   "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne*

*Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  "An

equal protection violation occurs when the government treats someone differently than another

who is similarly situated" and there is no rational basis for the difference.  *Penrod v. Zavaras*, 94

F.3d 1399, 1406 (10th Cir. 1996) (citation omitted).[5]

   Defendant APS argues that the Court should deny Plaintiff's motion because she has not

set forth evidence indicating that Matthew is similarly situated to other first-grade students.

*Campbell v. Buckley*, 203 F.3d 738, 747 (10th Cir. 2000) ("In order to assert a viable equal

protection claim," a plaintiff must "first make a threshold showing that [he or she was] treated

differently from others who were similarly situated to them.").  Defendant APS points out that

Matthew has a history of problems at school.  Matthew was expelled from his private preschool

for misbehavior that included threatening other children, hitting other children, yelling at children

---

   [5] If a plaintiff alleges violation of a fundamental right or discrimination against a suspect
class, heightened scrutiny applies.  *See id.*

and staff, and slapping his teacher in the face.  Before APS determined that Matthew qualified for special education, Matthew frequently argued with other students and teaching staff, grabbed a teacher, threatened other students, kicked another student, pinned another student against the cafeteria window, hit a student, broke pencils, repeatedly defied directives from his teacher, and constantly disrupted instruction.  After APS transferred Matthew to Defendant Brady's classroom, based upon the determination that Matthew qualified for special education, Matthew's behavior problems continued.  While in Defendant Brady's class, Matthew consistently was disruptive and angry.  At one point, Plaintiff reported that Matthew was having seven to ten tantrums at school daily, most of which were maximum intensity and lasted from ten minutes to one hour.  Matthew hit and kicked his desk daily and approached other children aggressively. Matthew regularly threatened teachers and other students.  Matthew would yell, "You're dead. I'm going to kill you.  I'm going to throw hot oil on you and a match and gasoline," or "F*** you.  F*** you, you f***ing sons of b******.  You b******.  I'm going to kill you.  I'm going to throw cat guts and blood on you."  Matthew also punched Defendant Brady's educational assistant in the stomach once, tried (and often succeeded) to kick her daily, and spit on her.

Based upon these facts, the Court concludes that although Plaintiff presented evidence that APS treated Matthew (and other ED students) differently from non-ED students of a similar age, Matthew was not similarly situated to the non-ED students.  Although on several occasions Matthew was placed in timeout for conduct that one could imagine other six-year-olds engaged in, *e.g.,* not following directions, mimicking peers, and giving angry looks, Matthew had a history of severe inappropriate behavior as well as a disability of emotional disturbance.  Moreover, Plaintiff presented no evidence regarding the behavior of other six-year-old students or APS's

treatment of those students.  Accordingly, Plaintiff has not made a threshold showing that Matthew is similarly situated to other first grade students.  The Court therefore denies Plaintiff's motion for summary judgment on her equal protection claim.

II.     Defendant APS's Motion for Summary Judgment.

        Defendant APS argues at the outset that it is not liable for Plaintiff's municipal capacity claims because the individual Defendants did not violate Matthew's constitutional rights.  This Court already has held, however, that based on the facts construed in Plaintiff's favor, Plaintiff has stated a constitutional violation of the Fourth and Fourteenth Amendments.  *See* Mem. Op. and Order deciding Motion for Summary Judgment on Grounds of Qualified Immunity for Defendants Brady, Willis & Flippo, filed of even date herewith.  Accordingly, the Court denies Defendant APS's motion for summary judgment on this ground.

        Defendant APS next argues that it is entitled to summary judgment in its favor because Plaintiff has not alleged facts sufficient to establish that APS had an official policy and practice that was a moving force behind a constitutional violation.  First, APS argues that Plaintiff has not demonstrated that APS had a policy and practice of relying on "waiver" teachers for provision of special education to students with disabilities which resulted in Matthew's subjection to physical and emotional harm from Defendant Brady and other APS employees in her classroom.  Plaintiff, in response, does not present evidence or argument identifying a policy of hiring waiver special education teachers or a widespread practice of hiring special education teachers on waiver.  The sole relevant evidence set forth by Plaintiff is that Defendant APS hired Matthew's teacher Ms. Brady on waiver.  Because Defendant Brady had not completed some special education classes, APS requested a temporary license for Brady, which the Public Education Department granted.

Evidence of a single instance of hiring a special education teacher on waiver is not sufficient to establish a practice so permanent and well settled as to constitute a custom or usage with the force of law.  The Court therefore grants Defendant APS's motion for summary judgment on Plaintiff's municipal liability claim based upon a policy or practice of relying on waiver teachers.

Second, Defendant APS argues that it is entitled to summary judgment in its favor on Plaintiff's municipal liability claim based upon a policy or practice of making school principals solely responsible for provision of special education to students with disabilities.  In response, Plaintiff does not present argument or identify facts establishing a policy of delegating sole responsibility for the provision of special education to school principals or establishing a widespread practice of making school principals solely responsible for special education.  Because Plaintiff has not satisfied her summary judgment burden, the Court grants Defendant APS's motion for summary judgment on this claim.

Third, Defendant APS argues that it is entitled to summary judgment in its favor on Plaintiff's municipal liability claim that APS failed to have an appropriate written policy on the use of timeout rooms.  APS initially argues that the standard of proof to establish a constitutional violation based upon a claim of failure to implement a specific policy is strict.  Plaintiff, however, has not alleged that APS failed to enact a policy regarding timeout rooms.  To the contrary, Plaintiff maintains, and presents evidence demonstrating, that APS had an official policy regarding the use of timeout rooms.  Plaintiff's contention is that APS's timeout room policy was not "appropriate."

To the extent Defendant APS argues in its reply brief that Plaintiff has not identified a policy, custom, or practice regarding the use of timeout rooms, the Court disagrees.  As noted,

Plaintiff has presented evidence that APS has an official policy regarding the use of timeout rooms. Specifically, Plaintiff identifies the "Standards for Use of Time-Out," and "Best Practice Use of Restraint for Students with Disabilities," which were posted outside of Defendant Brady's timeout room and referred to as APS's official policy regarding timeout rooms. This Court already has held that these documents constitute evidence of an official policy.[6] The Court therefore concludes that Plaintiff has raised a genuine issue of material fact on this question.

To the extent Defendant APS also argues that Plaintiff has not established that APS's implementation of the timeout policy was a direct cause of the stated deprivation of Matthew's constitutional rights, the Court further concludes that the facts construed in Plaintiff's favor demonstrate that Defendant Brady and her staff placed and restrained Matthew in the timeout room pursuant to the policy. This evidence supports a direct causal link between the timeout policy and the alleged deprivation of Matthew's constitutional rights. Plaintiff therefore has satisfied her summary judgment burden of demonstrating that a question of fact exists with respect to whether APS's timeout policy was the moving force behind the stated constitutional violations. Accordingly, the Court denies Defendant APS's motion for summary judgment on Plaintiff's municipal liability claim based upon the failure to have an appropriate written policy on the use of timeout rooms.

---

[6] Defendant APS's argument that APS teachers could have found Standards for Use of Time-Out in any general source of information widely available to APS teachers, and that Plaintiff cannot demonstrate the Standards were adopted and promulgated by municipality officials, does not persuade the Court otherwise. Indeed, APS has admitted that the Standards for Use were adopted by APS and that the Standards constituted the written policy on timeout room that the school received from APS. Moreover, in light of these concessions, Plaintiff has raised a material question of fact whether the Standards for Use of Time-Out were promulgated by an individual with decision making authority.

Fourth, Defendant APS argues that it is entitled to summary judgment in its favor on Plaintiff's municipal liability claim that APS failed to have an appropriate written policy on the use of physical restraint and aversives. Defendant APS maintains that Plaintiff has not identified any specific incidents of restraint, explained how or why the restraint was improper, indicated when the improper restraint occurred, indicated who improperly restrained Matthew, or provided other substantive facts to establish an unconstitutional use of physical restraint and aversives. Plaintiff does not dispute, for purposes of Defendant APS's motion, that she did not personally observe "any person ever restrain[ing] Matthew in a manner that was improper." Def. APS's Mot. for Summ. J, at 7. Plaintiff, however, has come forward with specific instances of restraint that APS staff described in its employees' handwritten notes of Matthew's timeouts. When construed in Plaintiff's favor, these facts indicate that Defendant Brady and her assistants used physical restraint to place and detain Matthew in the timeout room on numerous occasions for things such as failing to follow directions to begin work on phonics. Plaintiff therefore has satisfied her summary judgment burden of raising a factual question with respect to whether APS improperly restrained Matthew.

APS also argues that Plaintiff cannot establish that the absence of a physical restraint policy was the moving force behind a deprivation of Matthew's constitutional rights. Plaintiff, however, does not argue that APS did not have a physical restraint policy; to the contrary, Plaintiff maintains that the Best Practice Use of Restraint and the Standards for Use of Time-Out constitute the municipality's official policy regarding restraints. To the extent APS claims that its policy with respect to physical restraint was not the moving force behind any alleged constitutional deprivation, the Court disagrees. Defendant APS presented evidence that its staff

-18-

acted pursuant to the policy.  The policy was posted outside of Defendant Brady's timeout room, and APS complied with the policy's requirements.  For example, consistent with the policy, APS's staff members likely to use physical restraint were trained in therapeutic de-escalation (learning both non-physical interventions and physical restraint for situations when a child poses a danger to himself or others).  This evidence demonstrates a direct causal link between APS's restraint policy and the alleged deprivation of Matthew's constitutional rights.  Accordingly, the Court concludes that Plaintiff has raised a genuine question of fact with respect to whether Defendant Brady and other APS staff's use of physical restraint pursuant to the policy was a direct cause of the violation of Matthew's rights.  The Court therefore denies Defendant APS's motion for summary judgment on Plaintiff's municipal liability claim based upon the failure to have an appropriate written policy on the use of physical restraint and aversives.

## CONCLUSION

For the foregoing reasons, **IT THEREFORE IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support, filed November 1, 2006, **[Doc. No. 99]**, is hereby denied.

**IT FURTHER IS ORDERED** that Defendant APS's Motion for Summary Judgment on Plaintiff's Section 1983 Claims, filed November 1, 2006, **[Doc. No. 94]**, is granted in part and denied in part as follows:

(1)     APS's motion for summary judgment on Plaintiff's municipal liability claim based upon a policy and practice of relying on "waiver" teachers for provision of special education to students with disabilities which resulted in Matthew's subjection to physical and emotional harm from Defendant Brady and other APS employees in her classroom is GRANTED;

(2)     APS's motion for summary judgment on Plaintiff's municipal liability claim based upon a policy or practice of making school principals solely responsible for provision of special education to students with disabilities is GRANTED;

(3)     APS's motion for summary judgment on Plaintiff's municipal liability claim based upon APS's failure to have an appropriate written policy on the use of timeout rooms is DENIED; and

(4)     APS's motion for summary judgment on Plaintiff's municipal liability claim based upon APS's failure to have an appropriate written policy on the use of physical restraint and aversives is DENIED.

Dated this 15th day of May 2007.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE