**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

JENNIFER COUTURE, individually and as
mother and next friend of M.C., a minor child,

       Plaintiff,

vs.                                                                                                                Civ. No. 05-972 JCH/DJS

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,
ELIZABETH EVERITT, in her individual and
official capacity, DEBI HINES, in her
individual and official capacity, PAT WILLIS,
in her individual and official capacity, JOE
FLIPPO, in his individual and official capacity,
and JACQUELINE BRADY, in her individual
and official capacity,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment on Plaintiff's Tort Claims, filed November 1, 2006, **[Doc. No. 96]**. The Court, having considered the motion, memoranda, and relevant law, and being otherwise fully informed, finds that the motion is not well taken and will be denied.

## BACKGROUND.[1]

Beginning when he was a preschooler and escalating through kindergarten and first grade, Plaintiff's son Matthew Couture exhibited severe and extreme behaviors, including hitting, kicking, spitting, threatening other children and adults, throwing furniture, using inappropriate language, and disrupting the educational process. In conjunction with the Individuals with

---

[1] The following facts are either undisputed or construed in Plaintiff's favor.

Disabilities Education Act (IDEA), APS evaluated Matthew and determined that he was eligible for special education services under the eligibility category of seriously emotionally disturbed. APS transferred Matthew to Governor Bent Elementary School, which had a classroom taught by Defendant Jacqueline Brady for children with emotional disturbances.

Matthew was a student in Defendant Brady's classroom from October 28, 2002, to January 9, 2003. Before Matthew began attending Governor Bent, Plaintiff signed an Individualized Education Program (IEP) developed on October 16, 2002, which specified "supervised time out" (but not use of a "timeout" room) as one among other interventions. Matthew's IEP also provided for use of a "[b]ehavior management system involving clear rules with consistent implementation of consequences, home-school communication, supervised time out, and therapeutic deescalation techniques by trained personnel." A question of fact exists with respect to whether home-school communication occurred on a daily basis.

Defendant Brady's classroom served five to seven students, all of whom had special needs centered around emotional and behavioral issues. Defendant Brady's classroom was staffed with a teacher and an adult educational aide. When Matthew was added to Brady's class, APS assigned a second educational aide to the classroom so that Matthew would always have one-on-one support from an adult.

Defendant Brady used multiple interventions and strategies to assist Matthew in developing appropriate behaviors, including a behavior rewards system for good behavior, small-group and one-on-one instruction, dinosaurs and other toys to interest Matthew in education, timeout (including self-referrals to timeout), physical closeness by the teacher or educational aide, modifications to the classroom behavior tracking system, communication notebooks between

home and school, and walks and other activities. Defendant Brady also tried to focus Matthew on academics in various ways. With the assistance of Defendant Joe Flippo, Brady implemented a technique called "the child's game" that used praise and positive reinforcement. In addition, Defendant Brady tied gross motor activities to academic instruction in order to help Matthew focus on academics, and she also used games, toys, and arts and crafts to make learning more exciting and productive for Matthew.

    Defendant Brady's classroom was equipped with a timeout room. APS developed its own standards for the construction of timeout rooms, and the structure of the timeout room in Defendant Brady's classroom complied with these standards. The room, which was approximately six feet in width by six feet in length, was lighted and empty, and had carpet on the floor and walls. The room did not have a lock on the door and teaching staff were able to see into the room through a shatter-proof window in the door. APS staff, however, forcibly restrained the door while Matthew was in the timeout room, thereby preventing Matthew from leaving the room. APS staff also covered the small window in the door with black construction paper when Matthew used the window as a device to antagonize others.

    During the time when Matthew attended Governor Bent, timeout rooms were only located within two "ED" classrooms, *i.e.*, Defendant Brady's classroom and Diane Cook's classroom. Ms. Cook's classroom, like Defendant Brady's classroom, was for children with emotional disabilities. Timeout rooms were not in any other classrooms at Governor Bent; the rooms were developed and used only for emotionally disturbed children.

    Matthew engaged in disruptive and threatening conduct multiple times every day that he was in Defendant Brady's classroom. Depending upon the nature of the incident, Defendant

Brady and her staff used multiple interventions, including taking Matthew for walks outside; placing Matthew in timeout as his desk, timeout in the timeout room with the door open, or timeout in the timeout room with the door closed; and sending Matthew to the principal's office.

Defendants documented the time Matthew spent in the timeout room in a series of incident reports. The Court incorporates by reference its summary of these incident reports (also referred to as timeout records) before the Court on the Motion for Summary Judgment of Defendants Brady, Flippo, and Willis. *See* Mem. Op. & Order, deciding Motion for Summary Judgment on Grounds of Qualified Immunity, filed on May 15, 2007. When David D'Antonio, a behavior consultant for students with emotional disturbances, saw APS's records documenting the time Matthew spent in the timeout room, he identified the records as "physical management documentation form[s]," which are used when a child is physically restrained. APS did not provide Plaintiff with a copy of the incident reports until the winter of 2005, before the due process hearing which took place in March of 2005. Plaintiff did not ask to review the incident reports prior to her request to do so for the due process hearing.

On some occasions, the door to the timeout room would remain open, and sometimes a teacher or educational aide would visit with Matthew while he was in the timeout room. On other occasions, Defendants would place Matthew in the timeout room alone and with the door closed. When Defendants placed Matthew in the timeout room, he was not allowed to leave the room until he was able to be quiet and calm for five minutes (the "five minute rule"). When he attempted to leave the room without being quiet and calm, Defendant Brady and APS staff prevented Matthew from doing so.

Defendant Brady and/or her staff enforced the five minute rule arbitrarily, strictly applying

the rule against Matthew (so that when he spoke with only ten seconds of silence left, the five-minute period started anew), but on other occasions refusing to let Matthew out of the timeout room when he had complied with the rule and been silent for five minutes (because of a minor infraction, such as remaining silent at the expiration of five minutes when Brady's assistant asked Matthew whether he wanted to be released).

At all times when Matthew was in the timeout room, an adult sat either in the doorway or on the other side of the closed door to the timeout room. The adult would visually observe Matthew through the window of the door to the timeout room.

It is not uncommon for students to threaten to vomit, urinate, or defecate, as a means of manipulating their way out of the timeout room. Matthew urinated in the timeout room once, but did so within five minutes of being placed in the timeout room. Matthew had the ability to control his bladder.

A dispute of fact exists with respect to whether it is counter-productive to release a child from a timeout room before he or she deescalates, with Defendants arguing that it would have been counterproductive to release Matthew and Plaintiff arguing that it was counterproductive to keep Matthew in the timeout room. The parties point to specific facts in support of these arguments, which are described in the Memorandum Opinion and Order on the Defendants Brady, Willis and Flippo's Motion for Summary Judgment on Grounds of Qualified Immunity. *See* pp. 6-10. The Court incorporates those facts herein.

The behavioral consultant Mr. D'Antonio does not have personal knowledge of how Defendants used the timeout room with respect to Matthew. Mr. D'Antonio testified that generally speaking a timeout room can be used when a student is a threat to him or herself or

others, or when a student is disrupting the educational process.

Governor Bent Elementary School created a crisis intervention team, which consisted of several school staff members who could be called to restrain a child if he or she was acting in an aggressive or threatening manner. All of the persons on the crisis intervention team completed therapeutic de-escalation training. Therapeutic de-escalation training teaches methods for de-escalating aggressive and threatening behavior. Therapeutic de-escalation training also teaches school staff how to restrain a student in a manner that is safe.

Defendants maintain that no untrained person ever restrained Matthew. Plaintiff points out that Wendy Orr, the second educational aide appointed to Defendant Brady's classroom, had not had restraint training when Matthew was in Brady's class. Plaintiff has not pointed to evidence, however, indicating that Ms. Orr physically restrained Matthew.

A question of fact exists with respect to whether APS or its staff improperly restrained Matthew. Specifically, Plaintiff's expert Pam Segal testified that all of the physical restraint APS staff used against Matthew was inappropriate and harmful.

## **STANDARD**

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Id.* at 248.

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

As a threshold matter, Defendants argue that they are entitled to summary judgment on Plaintiff's claims under the New Mexico Tort Claims Act because "the appropriate development and implementation of a student's individualized education plan (IEP) is not tortious." The IEP, however, did not specify use of a timeout *room*. The IEP also did not indicate that APS staff would forcibly place Matthew in the timeout room against his will, that APS staff would barricade the door to the timeout room to prevent Matthew from leaving, that APS staff would engage in a

physical match (holding the door shut while Matthew tried to push it open) with Matthew to keep him in the room, that APS staff would prevent Matthew from using the bathroom, and that (on the facts construed in Plaintiff's favor) APS staff would restrain Matthew in the timeout room for prolonged periods of time without reference to Matthew's emotional state. Defendants' argument that they were simply educating Matthew pursuant to the IEP, and that they would be liable for failing to place Matthew in the timeout room, is therefore unpersuasive.

Defendants also argue that Plaintiff's claims are barred by the New Mexico Tort Claims Act (NMTCA) because there is no "evidence that the school had knowledge that implementation of the IEP as written created a known risk of injury to Matthew, which the school ignored" and because there is no evidence "that APS's use of the time out room or physical restraint with other students, including any limited subset of students, was performed in a manner which was likely to place a population of students at risk." Under New Mexico law, employees of public schools, acting in the course and scope of their duties, are immune from liability, unless such immunity has specifically been waived pursuant to the NMTCA. The NMTCA waives immunity for claims against governmental entities that are based on "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. Sec. 41-4-6.

Defendants first argue that they are entitled to summary judgment because Plaintiff presented no evidence that the school had knowledge that their use of the timeout room created a known risk of injury to Matthew. The Court already has concluded, however, on the facts alleged by Plaintiff, that Matthew generally had greater control of himself prior to being placed in the timeout room than after being placed in the timeout room. Mem. Op. & Order, filed May 15,

2007, at 23 [Doc. 151].

For example, Plaintiff has presented evidence that on November 15, 2002, prior to being placed in the timeout room "Matthew [was] refus[ing] to do his spelling test," "th[rowing] his pencil into the back of the desk," and "start[ing] to walk forcefully, stomping feet, toward rest of class." Plaintiff's evidence demonstrates that after APS staff placed Matthew in the timeout room, he started "kicking the door," repeatedly cursing, "throwing his body up against the door," "spitting on the door," hitting his head, "acting violently, . . . wild and angry . . . like a wild animal," and "throwing himself against the walls and the door." Matthew was "violently banging the door open and shut," and an APS employee reported that she had to "put all [of her] weight against the door," "putting [her] foot on the shelf in front of [her], which [would] allow[ her] to have more force when [she] lean[ed] against the door."

Plaintiff's evidence also shows that on November 26, 2002, prior to being placed in the timeout room Matthew was not following directions and was plugging his ears, giving angry looks, and arguing with and agitating his peers. After being forcibly placed in the timeout room, Matthew began repeatedly screaming and using profanity, threatening to kill APS staff, kicking the walls, kicking the door, hitting the door, pounding on the door, and hitting his head on the wall. Also on November 26, 2002, prior to being placed in the timeout room, Matthew was trying to run from his desk, where he was supposed to be sitting in timeout. After APS staff placed him in the timeout room, Matthew began urinating in the room, running around, kicking the walls, and throwing himself against the walls. On December 5, 2002, prior to being placed in the timeout room, Matthew was not following directions to begin working on his phonics assignment. As he was being physically placed in the timeout room, Matthew began struggling,

trying to bite and grab the staff, and threatening the staff. While in the timeout room, Matthew continued threatening the staff and also began spitting, yelling, and throwing up.

Plaintiff has also presented evidence that raises a factual question with respect to whether it was appropriate to use physical restraint against Matthew. Specifically, Plaintiff's expert Pam Segal testified that all of the physical restraint APS staff used against Matthew was inappropriate and harmful. Based upon the forgoing evidence, the Court concludes that Plaintiff has raised a factual question with respect to whether APS and its staff knew or should have known that forcibly placing Matthew in the timeout room exacerbated his behavior and his emotional state, thereby heightening Matthew's risk of emotional or physical injury.

Defendants also argue that the Court should grant summary judgment in their favor on Plaintiff's claims under the NMTCA because Plaintiff has not pointed to evidence indicating that APS's use of the timeout room or physical restraint placed a population of students at risk. For waiver to apply, a negligent operation or maintenance of a public building must create a dangerous condition that threatens the general public or a class of users of the building. *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006); *Espinoza v. Town of Taos*, 120 N.M. 680, 683, 905 P.2d 718, 721 (N.M. 1995). Defendants argue that, as in *Espinoza v. Town of Taos* and *Archibeque v. Moya*, Plaintiff's allegations of harm are limited only to a single individual. Therefore, according to Defendants, the State has not waived immunity for Plaintiff's claims.

In *Espinoza*, a child was injured on a public playground after falling from a slide while attending a city-sponsored day camp. *Id.* at 681, 905 P.2d at 719. The child's parents claimed two kinds of negligent supervision: (1) an inadequate number of day camp personnel to supervise

-10-

the children and (2) negligence by day camp personnel in not watching their child closely enough. *Id.* at 681-82, 905 P.2d at 719-20. The New Mexico Supreme Court rejected the parties' claim under Section 41-4-6 because in their pleadings the parents alleged nothing more than negligent supervision, which is not a specific waiver under the NMTCA. *Id.* at 683-84, 905 P.2d at 721-22. The *Espinoza* court also relied upon the corollary proposition that the NMTCA does not waive immunity for a single, discrete administrative decision affecting only a single person, as opposed to a dangerous condition affecting the general public. *Id.* (citation omitted).

In *Archibeque v. Moya*, the New Mexico Supreme Court held that one employee's negligent performance of an administrative function, putting at risk a single individual, did not fall under the waiver of immunity. 116 N.M. 616, 619, 866 P.2d 344, 347 (N.M. 1993). In *Archibeque*, a prison administrator negligently failed to check a list of names before placing an inmate into an area of the prison with his known enemies. *Id.* at 618, 866 P.2d at 346. In declining to equate this with negligent operation of a building under Section 41-4-6, Chief Justice Ransom noted the difference between cases involving only a "discrete administrative decision" that did not make the premises any more dangerous beyond "the reasonable and expected risks of prison life," and the cases demonstrating "a general condition of unreasonable risk from negligent security practices," for which the TCA does waive immunity. *Id.* at 622, 866 P.2d at 350 (Ransom, J., specially concurring); *accord Upton*, 141 P.2d at 1264. That general condition later surfaced in *Callaway v. New Mexico Department of Corrections*, when prison officials allowed violent gang members to mingle with the general prison population, thereby creating a dangerous condition based on more than just a single administrative decision affecting one individual. 117 N.M. 637, 643, 875 P.2d 393, 399 (N.M. Ct. App. 1994) (concluding that the security practices

in place resulted in unsafe conditions for the entire prison population).

The facts construed in Plaintiff's favor indicate that APS employees engaged in a series of acts that created a dangerous condition not only for Matthew, but also for other students in the ED program who were subject to Defendants' same practices. Plaintiff alleges that Defendants "had a duty to maintain the safe condition of the physical premises of Governor Bent Elementary School, which premises included the 'time out' room within the classroom of defendant Brady," that Defendants "were negligent in their operation of the timeout room," and that this negligent operation "constituted a dangerous or unsafe condition that created a potential risk to the general pubic." Unlike the claims in *Espinoza* and *Archibeque*, Plaintiff's claim is based upon the failure to maintain the safe condition of the timeout room generally and not simply failure to supervise a single student. *Compare Espinoza*, 120 N.M. at 681-82, 905 P.2d at 719-20 (explaining that parents claimed negligent supervision--an inadequate number of day camp personnel to supervise the children and negligence by day camp personnel in not watching their child closely enough; parents did not claim that playground equipment was negligently operated or maintained thereby creating a risk for children generally); *Archibeque*, 116 N.M. at 620, 866 P.2d at 348 (holding that the plaintiff's claims were based upon a discrete administrative function and that prison officials had not created an unsafe condition on the premises as to the general prison population); *with Upton*, 141 P.2d at 1265 (concluding that parents alleged more than negligent supervision of their child standing alone because the parents challenged the School District's general failure to implement promised safety policies for at-risk students and explaining that the "[f]ailure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time"); *Callaway*, 117 N.M. at 643, 875 P.2d at

399 (concluding that prison officials created a dangerous condition based on more than just a single administrative decision affecting only one inmate, as in *Archibeque*, where officials allowed violent gang members to mingle with the general prison population).

Moreover, the evidence indicates that Defendants used the timeout room not simply for Matthew, but for all children labeled as emotionally disturbed. Plaintiff has presented evidence that Defendants had two classrooms equipped with timeout rooms and that APS and its staff used these timeout rooms for emotionally disabled students generally and not simply for Matthew. This case, therefore, is unlike *Espinoza* or *Archibeque* in that the dangerous condition here (*i.e.*, the negligent operation of the timeout room) was connected to the operation or maintenance of the building and was not simply an isolated administrative decision impacting one individual. The Court therefore denies Defendants' motion for summary judgment on this ground.

Plaintiff argues, in the alternative, that if Defendants have not waived immunity pursuant to Section 41-4-6, Defendants are liable to Plaintiff for the intentional torts assault and battery, intentional infliction of emotional distress, and false imprisonment. Because the Court has denied Defendants' motion for summary judgment on Plaintiff's negligent operation claim, the Court need not consider whether Defendants' are entitled to summary judgment on Plaintiff's alternative intentional tort claims.

## **CONCLUSION**

For the foregoing reasons, **IT THEREFORE IS ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Tort Claims, filed November 1, 2006, **[Doc. No. 96]**, is DENIED.

Dated this 18th day of May 2007.

>
> _____
> JUDITH C. HERRERA
> UNITED STATES DISTRICT JUDGE