# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**JENNIFER COUTURE, individually and
as mother and next friend of M.C., a
minor child,**

           **Plaintiff,**

vs.                                                                                                 Civ. No.  05-972 JH/DJS

**BOARD OF EDUCATION OF ALBUQUERQUE
PUBLIC SCHOOLS, et al.,**

           **Defendants.**


## MEMORANDUM OPINION AND ORDER

      This matter is before the Court on *Defendant APS' Motion for Judgment On Plaintiff's IDEA, Section 504, and ADA Claims* [Doc. No. 87].  After reviewing the briefs, the law, and the administrative record, as well as the supplemental briefing, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims under the IDEA, and partial summary judgment on Plaintiff's claims under Title II of the ADA and Section 504 of the Rehabilitation Act.  Thus, the motion will be granted in part and denied in part.  Furthermore, the parties' motions in limine and motion to strike will be denied at this time, with leave to refile them in the future if necessary.

## FACTS

      Plaintiff sues on behalf of her minor child, Matthew, in relation to certain special education services that he received as a first and second grader within APS.  As a kindergartener at Montezuma Elementary School during the 2001-2002 school year, Matthew had not been identified as a child with special needs.  However, during that year Matthew displayed difficulty with academic skills such as letter recognition, letter-sound relationships, and math.  He also often

threatened or hurt other children and was noncompliant with verbal instructions.  As a result of his academic issues, in February of 2002 Matthew's kindergarten teacher referred him to the school's Student Assistance Team.  The teacher also used various techniques to deal with Matthew's problems, including one-on-one teaching, simplification of instructions, preferential seating, reward systems, and frequent communications with Plaintiff and her mother.  Near the end of the school year, Plaintiff consented to an academic evaluation of Matthew by a multidisciplinary team ("MDT").  The evaluator, Margaret Dill, found that Matthew did not meet the criteria for "specific learning disability," but also explained that most evaluation specialists are hesitant to apply that diagnosis to a kindergarten student because of their young age and lack of academic experience.  After a meeting, the MDT decided not to qualify Matthew for receipt of services as learning disabled.

In August of 2002, Matthew began first grade at Montezuma in the classroom of Judith Hay.  He immediately demonstrated inappropriate and sometimes violent behavior, including but not limited to destroying property, disparaging and threatening teachers and students, grabbing and hitting both teachers and students, yelling, breaking pencils, and other disruptive actions. Matthew's conduct occurred both in and out of the classroom, and therefore was not necessarily tied to academic work.  Hay tried to reach Matthew with positive rewards, individualized instruction, and preferential seating, as well as by temporarily removing him from the classroom to allow him to calm down, and by talking to him and Plaintiff.  She also implemented a phonics reading program for him.  Ultimately, she referred Matthew to the school's mental health team.  In September of 2002, an APS psychologist[1] conducted a screening of Matthew because of his extreme oppositional

---

[1] Matthew had been seeing a private psychologist as well.

behavior. She noted that Matthew suffered from lack of achievement, but stemming not from an underlying learning disability, but rather from psychological issues. The psychologist also recommended that Matthew be assessed for eligibility for special education services.

In October 2002, evaluation specialist Margaret Dill determined that Matthew was eligible for receipt of special education on the basis of the disability "emotional disturbance." She determined that he did not meet the criteria for "specific learning disabled" because it could not be ruled out that his academic difficulties resulted from his emotional disturbance and behavior problems. *See* 20 U.S.C. § 1401(30)(C) (formerly § 1401(26(C)) ("specific learning disability does not include a learning problem that is primarily the result of . . . emotional disturbance . . ."). Dill based that conclusion on input from both Hay and Plaintiff.

From October 28, 2002, to January 9, 2003, Matthew attended Governor Bent Elementary School, where he was placed in a class for emotionally disturbed children taught by Defendant Jacqueline Brady. Brady's class was comprised of five to seven children and staffed with a teacher and an adult educational aide. When Matthew joined Brady's class, APS assigned a second educational aide to the classroom so that Matthew would always have one-on-one support from an adult. Brady had experience with special needs children. Immediately before working at Governor Bent, Brady served for two years as the educational director of day treatment at the Children's Treatment Center. Before that, Brady served for eight months as the behavior manager for a child at Cleveland Middle School.

On October 16, 2002, Plaintiff signed an Individualized Education Program ("IEP") for Matthew which specified "supervised time out" (but not use of a "timeout" room) as one among other interventions. A Behavioral Intervention Plan ("BIP") prepared on December 17, 2002, indicated that Matthew would be placed in "time out if he loses control and if he threatens to hurt

self or others."

While in Brady's class, Matthew consistently was disruptive and angry. At one point, Plaintiff reported that Matthew was having seven to ten tantrums at school daily, most of which were maximum intensity and lasted from ten minutes to one hour. Matthew shouted, hit and kicked his desk daily, and approached other children aggressively. In addition, Matthew regularly directed specific and graphic threats of violence against teachers and other students, and he used obscenities. Because she worked with Matthew one on one, Wendy Orr ("Orr"), Brady's educational assistant, was often a physical target of Matthew's violence. Matthew punched her in the stomach once, tried (and often succeeded) to kick her daily, and spit on her. Matthew's behavior severely impacted the other children in the classroom. Essentially, Brady and Orr had to spend time ensuring the safety of these children and re-teaching them self-control instead of advancing their education.

Matthew's behavior at home also was problematic. Plaintiff reported that Matthew was having tantrums at home in December 2002, and during a mental health team meeting on January 6, 2003, Plaintiff disclosed that Matthew "pulled a butcher knife" on her. She also stated that Matthew was upset because her boyfriend was living with them and that Matthew's behavior had deteriorated since he had moved in. In December 2002, Matthew's pediatrician indicated that Matthew might be bipolar and emphasized the "importance of moderating the changes that have occurred," referring to Plaintiff's move and her boyfriend's presence.

With regard to academics, Brady and Orr employed the Four Blocks reading program and developed innovative techniques to de-escalate and re-direct Matthew so that they could teach him scholastically. These techniques included an award system for good behavior, not directing attention to negative attention-seeking behaviors, physical proximity, redirection through soft touching, small-group and one-on-one instruction, and verbalization of needs through calm

4

discussion. With the assistance of Defendant Joe Flippo ("Flippo"), Brady implemented a technique called "the child's game" that used praise and positive reinforcement. In addition, Brady tied gross motor activities to academic instruction in order to help Matthew focus on academics, and she also used music, movement, dance, games, toys, and arts and crafts to make learning more exciting and productive for Matthew. Brady permitted Matthew to form letters out of clay, chew pretzels into the form of letters, to paint his spelling words, and to write words on the pavement in chalk. She tried taking him outdoors so that he could pick up pine needles for use in counting and doing math. Finally, Matthew was provided with a great deal of one-on-one attention.

When Matthew's behavior escalated and became extreme, which happened both in and out of the classroom, Brady and Orr would ask Matthew whether he needed a timeout at his desk, in the timeout chair, in the timeout room, or even if he needed to go outside for walks. By asking questions and presenting options, Brady and Orr tried to teach Matthew the skill of self-redirection, so that Matthew could focus his attention on academics. However, Brady used time outs in the timeout room to de-escalate Matthew's behavior when he became violent or a threat to himself or others. Over the course of about two and one-half months, Brady placed Matthew in the timeout room 21 times for a total of approximately twelve hours.

On December 17, 2002, Plaintiff informed the MDT that she was considering hospitalizing Matthew. The following month, on January 9, 2003, the IEP team, including Plaintiff, designed a new IEP for Matthew which included an abbreviated day in Brady's classroom (in the hopes that Matthew's behavior would improve during a shorter school day) and referral to the neuromotor committee. Plaintiff also asked that Brady stop using timeouts. However, the new program was unsuccessful, and on January 30, 2003, the team determined that Matthew should be placed on homebound services. Flippo, an APS psychologist, conducted a psychological pre-evaluation of

Matthew, and the report he issued on February 24, 2003 indicated that Matthew had significant difficulties with anxiety, mood disorder, oppositional-defiant behavior, and threats of harm to himself and others. He recommended a psychoeducational needs evaluation for Matthew. Flippo also reported that, according to Plaintiff, Matthew's behavior had improved over Christmas break while he was away from school.

The teacher assigned to provide Matthew with homebound services attended the January 30, 2003 IEP meeting. He attempted to work with Matthew on academic goals at home, but had difficulty getting Matthew to settle down and focus on academics; Matthew required constant redirection. Consequently, the homebound teacher did not succeed in providing him with much instruction. He expressed concern over Matthew's behavior, including inappropriate sexual references. Shortly thereafter, Plaintiff hospitalized Matthew for his psychological problems. He was diagnosed with mood disorder and pervasive developmental disorder. Upon his release in April of 2003, Matthew returned to Montezuma Elementary and APS recommended that Matthew be placed in a therapeutic day program.

In the fall of 2003, Matthew attended second grade at Montezuma Elementary, taught by Jack Tugwell ("Tugwell"). APS conducted a neuromotor evaluation and speech-language evaluation of Matthew, which showed sensory integration issues affecting his ability to modulate his arousal system and difficulty with speech-language categorization. APS decided to provide him with six hours per month of occupational therapy and speech-language services. Behaviorally, Matthew's performance varied depending on his medication changes and who was in the class. With regard to academics, Tugwell used multi-sensory techniques, phonics, flash cards, sound association, picture matching, as well as individual and small group work in order to teach Matthew. He made progress with letter identification and letter-sound association. In the spring of 2004, the

IEP team decided that Matthew should remain in the therapeutic day program and continue receiving speech-language and occupational therapy. The team noted that Matthew's behavior had improved significantly, that he had made progress in reading and writing, and that he was excited about math.

In August of 2004, Matthew began third grade at Montezuma elementary. His new teacher taught Matthew reading using the Wilson and Four Blocks reading programs, worked with him one-on-one on vowel and consonant sounds, phonetics, and structural analysis using context to decode words. He also studied math with modifications. Matthew's achievements varied with his level of focus. APS provided the teacher with training on de-escalation of disruptive behaviors. She used supervised timeout, though usually Matthew took himself to timeout when necessary.

In December of 2004 Matthew and Plaintiff moved out of state, and therefore APS no longer educated Matthew.

## PROCEDURAL BACKGROUND

On November 19, 2004, Plaintiff initiated an administrative action pursuant to the Individuals with Disabilities Education Act ("IDEA") against APS. The complaint asserted violations under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the IDEA, 20 U.S.C. §§ 1400- 1482, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. Plaintiff claimed that Matthew was denied a free appropriate education ("FAPE"), and was discriminated against on the basis of a disability, because APS failed to: (1) consider Matthew's eligibility as a student with a specific learning disability; (2) document the decision not to classify him as a student with a learning disability; (3) provide special education consistent with the existence of a learning disability; and (4) write or implement an IEP reasonably calculated to meet Matthew's needs as a child with a disability. She also claimed that the district discriminated against Matthew by sanctioning or ignoring reliance upon timeouts and physical restraint as strategies in

an educational setting when such strategies would not be tolerated if directed at non-disabled children.

The Due Process Hearing Officer ("DPHO") held a three day hearing.  She found no evidence of inadequate instruction or a denial of a FAPE, and no evidence of discrimination or exclusion from participation in the educational process. While acknowledging that not all of the Defendants' techniques were successful, she found that "[APS] provided the student with an array of appropriate interventions, supports, and services . . . that were individually designed to meet his needs. . . ."  "The lack of any spectacular level of success was not due to any lack of trying on the part of the staff, nor was it caused by any failure on the part of the district to meet legal requirements or to apply the expected level of professional educational acumen [ ]."  The DPHO denied all of petitioner's claims and dismissed them with prejudice.

On September 9, 2005, Plaintiff filed her complaint in this case appealing the DPHO's decision.  She asserts claims under the IDEA, ADA, and § 504 of the Rehabilitation Act, and added constitutional claims brought pursuant to 42 U.S.C. § 1983 (unreasonable seizure, procedural and substantive due process, and equal protection) and a variety of common law tort claims against individual defendants.

## DISCUSSION

I.  **MOTION FOR SUMMARY JUDGMENT ON IDEA CLAIMS [Doc. No. 87]**

   A.  **Requirements Imposed by the IDEA**

The IDEA is a federal statute aimed at helping states provide disabled children with a free and appropriate public education.  Central to the IDEA is the requirement that local school districts develop, implement, and annually revise an individualized education program ("IEP") calculated to meet the eligible student's specific educational needs.  *See id.*  § 1414(d).  In addition, the IDEA

specifies that disabled children should be educated in the "least restrictive environment," meaning that, "[t]o the maximum extent appropriate," disabled children should be educated in public school classrooms alongside children who are not disabled. *Id*. § 1412(a)(5)(A).

In order to determine whether he has received a FAPE, the Court must determine whether Matthew's IEP's were "reasonably calculated to enable [him] to receive educational benefits," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982); *see also Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008). If the IEP's were so calculated, the school district can be said to have provided a FAPE; if not, then not. The Court also must inquire whether the school district has complied with the procedural requirements of IDEA. *See Rowley*, 458 U.S. at 206-07, 102 S.Ct. 3034. The Supreme Court has further explained that this standard is not an onerous one. "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make . . . access meaningful. . . . [T]he intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034.

The burden of proof under the IDEA is on the party challenging the appropriateness of the child's educational program. *Schaffer v. Weast*, 546 U.S. 49, 57-61 (2005).

**B.      Standard of Review**

In assessing whether Plaintiff has carried her burden of establishing that APS failed to meet these standards with respect to Matthew, the Court must apply a somewhat unique standard of review. "Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified *de novo* standard when reviewing agency disposition in the IDEA context." *Garcia*, 520 F.3d at 1125;  20 U.S.C. § 1415(i)(2)(C). Specifically, the district court must (1) receive the record of the administrative proceedings, (2) hear

additional evidence at the request of a party,[2] and (3) base its decision on the preponderance of evidence. 20 U.S.C. § 1415(i)(2)(C) (formerly § 1415(i)(2)(B)). "At the same time, though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings, the fact findings of which are 'considered prima facie correct.'" *Garcia*, 520 F.3d at 1125. The Tenth Circuit Court of Appeals has concluded that the educational benefit mandated by IDEA must merely be "more than de minimis." *Urban ex rel. Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996). Finally, because the question before the Court is not whether the IEP will guarantee some educational benefit, but whether it is reasonably calculated to do so, Tenth Circuit precedent instructs that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student. . . . Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 701-02 (10th Cir. 1998).

C. **Analysis of IDEA Claim**

As an initial matter, the Court notes that Plaintiff has failed to identify any factual finding by the DPHO that is not supported by the preponderance of the evidence or a conclusion of law that is erroneous. After reviewing the evidence in the record, the Court concludes that the preponderance of the evidence supports the DPHO's factual findings. Specifically, the Court finds that there is no evidence that APS's efforts in educating Matthew in reading, writing, spelling, or math were

---

[2] Plaintiff has moved to present additional evidence, and the Court has denied that motion. *See* Doc. No. 161. Thus, the Court will review only the administrative record currently before it.

inadequate and resulted in the denial of a FAPE. Furthermore, the use of timeouts for Matthew was reasonable on several grounds. First, timeouts were expressly provided for by Matthew's IEP as a way to teach him to control his own behavior. Second, the timeouts were a reasonable method to prevent Matthew from harming himself or others. Finally, the Court concludes that at all times APS provided Matthew with an educational program designed to meet his unique needs and to provide him with some educational benefit, and that it did so in the least restrictive environment.

Plaintiff relies on several arguments to support her theory that Matthew did not receive a FAPE. However, none of them has merit. First Plaintiff disagrees with APS' decision to classify Matthew's eligibility for IDEA benefits as "emotionally disturbed" instead of having a "specific learning disability." In support of her argument, Plaintiff points to evaluator Margaret Dill's report in which she finds that, based upon her testing, Matthew had a severe discrepancy between his intellectual ability and actual academic achievement. *See* DPH Ex. 10 at 9; Tr. at 125-26. However, the evidence also shows that Dill determined that Matthew met most of the criteria for "emotionally disturbed" as well. DPH Ex. 10 at 10. After consulting with Matthew's classroom teacher and with Plaintiff, Dill determined that his learning problems stemmed from his behaviors, which excluded him from classification as "specific learning disabled." *Id*. at 9-10; Tr. at 147. Thus, she classified Matthew at "emotionally disturbed." The preponderance of the evidence supports this decision.

Next, Plaintiff points to APS' failure to give Plaintiff or Matthew's future teacher, Jacqueline Brady, a copy of Dill's written evaluation report prior to the multi-disciplinary team's ("MDT") meeting to discuss Matthew's IEP. Tr. 785-788. Plaintiff suggests that this failure deprived her of the knowledge, needed at the MDT meeting, that Matthew was learning disabled and should have been classified as such, and that this "misclassification" resulted in an inappropriate IEP for Matthew. However, as already stated above, Dill had substantial support for her conclusion that

Matthew was not learning disabled, but rather his difficulties with learning stemmed primarily from his emotional disturbance and behavioral difficulties—a conclusion that was not only supported by his mother and his teacher, but also excluded him from classification as learning disabled. *See* 20 U.S.C. § 1401(30)(C) (formerly § 1401(26(C)) ("specific learning disability does not include a learning problem that is primarily the result of . . . emotional disturbance . . ."). Plaintiff has presented no authority that supports a requirement that she provide Plaintiff with her written report. Furthermore, Dill discussed the results of her testing with those attending the MDT meeting, at which Plaintiff was present. Tr. at 145. Even if APS committed a procedural error, that does not necessarily mean that it denied Matthew a FAPE. *Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1120 n.4 (10th Cir. 1999).

Plaintiff also contends that APS had a duty to have the school psychologist at the MDT meeting, again pointing to the fact that the school psychologist's report was not discussed or distributed at the meeting. She claims that this omission also resulted in inappropriate IEP for Matthew. The school psychologist tested Matthew shortly before Dill performed her tests. The psychologist's report, DPH Ex. 9, states that "Matthew suffers from a lack of achievement, but this is not believed to be the result of an underlying learning disability." *Id*. at 4. The psychologist concluded that "Matthew's behavioral and emotional problems are significantly impacting on his ability to achieve academically, and also in the area of social development as it pertains to peer relationships. Primary areas of concern include anger management, self-mastery and accomplishment, and impulse control." *Id*. at 5. Thus, the psychologist's report supports the decision to classify Matthew as emotionally disturbed. In contrast, Plaintiff has come forward with no evidence to show that either the classification of Matthew as "emotionally disturbed" was incorrect, or that having either Dill's report or the school psychologist's report before the MDT

meeting would have changed the team's decision on Matthew's classification.

Furthermore, Plaintiff asserts categorically that classification as "emotionally disturbed" resulted in a denial of FAPE to Matthew, but she fails to say why or how this is so. As described above, Matthew's teachers used a wide variety of techniques in their attempt to reach Matthew and help him develop positive behaviors so that he could concentrate on academics. Missing from Plaintiff's briefs is any evidence that either Matthew was denied a FAPE or that another teaching method or other components of instruction would have provided him with a FAPE. In fact, Plaintiff presents no evidence of any alternative teaching methods or behavior interventions that she contends APS should have provided to Matthew. She advocates the use of walks, positive reinforcement, and redirection, three techniques that APS utilized, though with limited success. Plaintiff simply has failed to present evidence demonstrating that Matthew's educational program was not reasonably calculated to provide him with a FAPE.

Next, Plaintiff argues that APS' use of restraint on Matthew was not permitted under the IDEA, was ineffective, and denied him a FAPE. First, Plaintiff points to nothing which indicates that the IDEA prohibits the use of restraints when appropriate. Although the IDEA does mention "positive behavioral interventions," 20 U.S.C. § 1414(d)(3)(B)(i), it does not limit an educator's choices only to "positive" interventions. Additionally, while the timeouts may not always have been effective, they did work part of the time. Further, the educators implemented this strategy from October 28, 2002 until January 9, 2003—just over two months. It was reasonable to believe that the technique might become effective over time if consistently implemented. The Court agrees with the Tenth Circuit that "Two months of mixed results is not such a long period that a reasonable teacher would necessarily have abandoned this option, particularly given that the technique was mandated by the IEP." *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1255 (10th Cir.

13

2008).

Finally, Plaintiff contends that she does not abandon her claims for an alleged denial of FAPE after January of 2003. However, Plaintiff's brief goes no further, and she presents no discussion, much less evidence, of how APS denied Matthew a FAPE during that period. Therefore, she has failed to meaningfully contest the DPHO's finding on that issue, and APS' motion for summary judgment will be granted.

Having decided that APS provided Matthew with a FAPE, the Court need not reach the statute of limitations argument raised by APS.

## II.     MOTION FOR SUMMARY JUDGMENT ON ADA and § 504 [Doc. No. 87]

For her claims against APS under the Americans With Disabilities Act ("ADA") and § 504 of the Rehabilitation Act, Plaintiff alleges a variety of facts that fall roughly into two groups. The first group of allegations assert, in essence, that APS's treatment of Matthew under his IEPs denied him a FAPE. Specifically, Plaintiff alleges that APS's placement of Matthew at Governor Bent Elementary School in Brady's classroom for emotionally disturbed children and its use of the timeout room for Matthew were a result of intentional discrimination against him as a student with a disability. Complaint, Doc. No. 1, at ¶ ¶ 76, 78. The second group of allegations that Plaintiff makes are more general and do not seem to be directly related to the education that Matthew received or his IEP. These allegations were not addressed by the DPHO and include discrimination resulting from APS's alleged policy and practice to rely on "waiver" teachers for students with disabilities, the practice of making school principals solely responsible for provision of special education services, and the failure to have an appropriate written policy on the use of timeout rooms and physical restraint. *Id.*, at ¶ ¶ 79-82. The Court addresses each group of allegations in turn.

14

A.  **Discrimination Claims Arising From Classifying Matthew as Emotionally Disturbed, Placing Matthew in Brady's Class at Governor Bent Elementary School, and Using the Timeout Room**

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the ADA adopts the substantive standards of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Office of Civil Rights Policy Letter, 20 IDELR 134, 135 (Oct. 7, 1993); *see also* 28 C.F.R. § 35.103(a) ("Except as otherwise provided in this part, this part shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 . . . or the regulations issued by Federal agencies pursuant to that title."). In turn, the regulations promulgated under Section 504 generally conform to the standards established by the IDEA, 34 C.F.R. § 104.31 et seq., and use substantially the same language regarding a school district's obligation to evaluate each disabled child, create an IEP with parental input, and provide each disabled child with an appropriate education. *See also See Smith v. Robinson*, 468 U.S. 992, 1017 (1984) (noting that the IDEA and Section 504 "are built around fundamental notions of equal access to state programs and facilities" and thus "their substantive requirements . . . have been interpreted to be strikingly similar").

In *Urban v. Jefferson Cty. Sch. Dist.*, 89 F.3d 720, 728 (10th Cir. 1996), the Tenth Circuit found that if a disabled child is not entitled to a neighborhood placement under the IDEA, he is not entitled to such a placement under Section 504. The court reasoned that if the educational institution had not violated the IDEA and denied the child a FAPE in making its decision regarding his placement, then its decision was not actionable under the ADA or Section 504. The Court has already concluded that APS did not deny Matthew a FAPE as a result of classifying him as

15

emotionally disturbed, placing him in Brady's class, and using the timeout room. APS argues that under *Urban*, its actions were not discriminatory because the Court has found that Matthew received a FAPE. The Court agrees. For the same reasons discussed above, the Court concludes that Matthew was not excluded from participation in or denied the benefits of a free public education. Therefore, APS is entitled to summary judgment on this portion of Plaintiff's claims under Section 504 and the ADA.

Plaintiff's reliance on *Ellenberg v. New Mexico Military Inst.*, 478 F.3d 1262 (10th Cir. 2007) is misplaced. In that case, a disabled child sued an educational institution and its board of regents, asserting claims under the IDEA, Section 504 of the Rehabilitation Act, and ADA, alleging that denial of child's admission application violated all three statutes. In concluding that the child's claims could go forward under the ADA and Section 504, the Tenth Circuit stated:

> Plaintiffs contend that NMMI unlawfully discriminated against S.E. in violation of the RA and the ADA by denying her admission on the basis of her disability even though she was "otherwise qualified" to attend, and that NMMI's qualifying admissions standards are "facially discriminatory." In the context of these pure discrimination claims, *the IDEA offers no relief, for they do not relate to the provision of a FAPE in the least restrictive environment*. Instead, they challenge the alleged discriminatory admissions practices of a state-funded secondary school. As we noted previously, the Supreme Court has long-recognized that the IDEA is simply not an anti-discrimination statute.

*Id.* at 1280-81 (emphasis added). Thus, when a plaintiff asserts pure discrimination claims, it may pursue those discrimination claims under the ADA and Section 504 without regard to whether her IDEA claim succeeds or fails. In contrast, when a plaintiff has claims that are educational in nature and relate to whether or not a child has received a FAPE in the least restrictive environment, the IDEA is the primary source of relief. A finding that the school has not violated the IDEA precludes the plaintiff's pursuit of those same educational claims under the ADA and Section 504.

With regard to his placement in Brady's class at Governor Bent Elementary and use of the

16

timeout room, Plaintiff's claims do relate to the provision of a FAPE in the least restrictive environment. Thus, because her claims have been disposed of under the IDEA, she does not get a "second bite at the apple" under the ADA or Section 504. Thus, APS is entitled to summary judgment on that portion of Plaintiff's discrimination claims.

> **B. Discrimination Claims Arising From Reliance on "Waiver" Teachers, Responsibilities of School Principals, and Lack of Appropriate Written Policies.**

In its motion for summary judgment and subsequent briefs, APS does not discuss this portion of Plaintiff's discrimination claims under Section 504 and the ADA. Indeed, it is not clear that APS has even moved for summary judgment on this portion of the claims, nor does it appear that the DPHO addressed these allegations in her decision. Similarly, Plaintiff does not discuss this part of her claim in her response brief or supplemental briefing. The parties have simply ignored it. On the record before it, the Court finds that to the extent APS has moved for summary judgment for this portion of Plaintiff's discrimination claim, that motion should be denied.[3]

## III. REMAINING MOTIONS

Both Plaintiff and Defendants have filed motions in limine, and Defendants have filed a motion to strike objections to exhibits. *See* Doc. Nos. 133, 134, 154. All three of the foregoing motions were filed shortly before the May 2007 trial setting. Since the motions were filed, the landscape of the case has changed dramatically. With the exception of the equal protection claim, judgment in favor of Defendants has been entered on all of Plaintiff's constitutional claims. With entry of this Memorandum Opinion and Order, Plaintiff will no longer have a claim under the IDEA. There are dispositive motions pending regarding Plaintiff's tort claims and her equal protection claim. And finally, this case currently is not set for trial.

---

[3] The Court expresses no opinion on the merit of the remaining discrimination claims.

In light of the foregoing, the Court finds that the motions in limine and the motion to strike exhibits are premature. For example, with the narrowing of legal claims and the elimination of certain defendants, the parties may find that they have no need to seek admission of certain evidence, thereby eliminating evidentiary disputes outlined in the motions. Thus, all three motions will be denied at this time. In the event that this case goes to trial in the future, the Court grants the parties leave to refile their motions to the extent that those motions remain relevant.

**IT IS THEREFORE ORDERED** that:

(1) *Defendant APS' Motion for Judgment On Plaintiff's IDEA, Section 504, and ADA Claims* [Doc. No. 87] is **GRANTED IN PART** and **DENIED IN PART**, as explained herein;

(2) *Defendants' Motion in Limine to Exclude Certain Evidence* [Doc. No. 133] is **DENIED**;

(3) *Plaintiff's Motion in Limine* [Doc. No. 134] is **DENIED**; and

(4) *Defendants' Motion to Strike Plaintiff's Objections to Defendants' Exhibits* [Doc. No. 154] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**